**Kevin TAYLOR, Petitioner–Appellant,**

v.

**Jerry D. GILMORE, Respondent–Appellee.**

**No. 91–1148.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1991.

Decided Jan. 21, 1992.

As Amended Jan. 21, 1992.

Robert Agostinelli, Office of the State Appellate Defender, Ottawa, Ill., Timothy P. O'Neill, argued, Chicago, Ill., for petitioner-appellant.

Douglas K. Smith, Asst. Atty. Gen., Office of the Atty. Gen., Criminal Appeals Div., Springfield, Ill., argued, for respondent-appellee.

Before POSNER, FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Kevin Taylor admitted that he stabbed his ex-wife's live-in lover to death, but maintained that his crime was manslaughter. An Illinois jury disagreed—maybe—and declared him a murderer. In this petition for a writ of habeas corpus, Taylor argues that his conviction was invalid because the instructions given the jury were defective, precluding it from returning a voluntary manslaughter verdict when one may have been appropriate.

Taylor's appraisal of the jury instructions in his case is well taken. The Illinois Supreme Court held in *People v. Reddick*, 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141 (1988), that nearly identical instructions offended Illinois statutory law, and this Court found in *Falconer v. Lane*, 905 F.2d 1129 (7th Cir.1990), that they ran afoul of the federal due process clause. Illinois prudently concedes that the instructions

given Taylor's jury were defective, and challenges the vitality of neither *Reddick* nor *Falconer*. It contends, however, that the retroactivity principles of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), deprive Taylor of the benefit of *Falconer* and *Reddick* because both cases announced "new rules" after his conviction became final and neither case falls within either of the two exceptions carved in *Teague*. The district court agreed and denied his petition for habeas corpus. 770 F.Supp. 445 (C.D.Ill.1990). Because we find that *Falconer* is not a "new rule," and therefore that Taylor is entitled to its retroactive application, we reverse and grant the writ.

## I.

### A.

Prior to the killing a tense relationship had developed between Taylor and Scott Siniscalchi, the new romantic interest and housemate of his ex-wife Joyce. Katie Taylor, the young daughter of Joyce and Kevin, lived with Joyce and Siniscalchi, and the two men argued on occasion when Siniscalchi would bring Katie to Taylor's trailer home for parental visits. Taylor also claimed that Siniscalchi ridiculed and antagonized him when both men were working at a fair.

The bad blood reached a boiling point on September 14, 1985. At approximately 1 a.m., Taylor called Joyce—not an uncommon occurrence, as she often worked late hours—to arrange for visitation plans with Katie the following morning. The two spoke for a few moments, agreed that Taylor would pick Katie up at Joyce's home, and hung up. Taylor then realized that he had other plans that morning, and called Joyce back to make alternate arrangements. Siniscalchi answered the phone and refused to let Taylor speak with Joyce; he claimed that she was tired and needed sleep. Taylor then asked Siniscalchi if he would bring Katie to meet Taylor at the municipal pool that morning. Siniscalchi refused, and (according to Taylor) said that he wasn't going to bring Katie anywhere to see Taylor. Finally, Taylor offered to pick

Katie up at that moment, to which Siniscalchi replied (again, according to Taylor), "Well, suit yourself, but you're not going to get her." XIII Tr. at 70.

Agitated that Siniscalchi was trying to keep him from his daughter, Taylor quickly drove to Joyce's apartment building. Before leaving his car, Taylor grabbed a sheathed hunting knife and stuck it in the side of his sweatpants. Taylor testified that he heard Katie crying when he approached the door of Joyce's apartment. He beat on the door, and when nobody answered he kicked it open. Taylor then searched for Katie and found her sitting on the floor in the master bedroom, where Joyce and Siniscalchi were sitting up in bed. Taylor testified that, when he reached to pick up Katie, Siniscalchi "started to roll out of bed and looked like he was reaching for something." *Id.* at 76. A fracas ensued between the three adults, and Taylor was thrown into a wall. While Siniscalchi was pulling his hair and shirt, Taylor grabbed the knife and stabbed Siniscalchi, who screamed, "[t]he knife is in me Joyce, the knife is in me." XII Tr. at 42. Siniscalchi died from his wounds, and Taylor was subsequently arrested.

### B.

At the time of Taylor's trial, Illinois homicide law provided that murder had two elements. First, the defendant must have performed the acts that caused the death of the victim; second, in performing those acts, the defendant must have intended to kill or do great bodily harm to the victim, must have known that the acts would cause great bodily harm or death, must have known that the acts created a strong probability of death or great bodily harm, or must have been committing a forcible felony (in Taylor's case, home invasion). Ill. Rev.Stat., ch. 38, ¶ 9–1 (1985). Voluntary manslaughter had three elements. The first two were, for all relevant purposes, the same as both elements of murder. The third was a mitigating mental state; the defendant must have acted either under a sudden and intense passion arising from a serious provocation, or under an unreason-

able (but honest) belief that deadly force was justified to prevent his imminent death or great bodily harm. *Id.* ¶ 9–2. In essence, the third element worked as a partial affirmative defense to a charge of murder—partial in that a successful defense effected a murder acquittal but a manslaughter conviction.[1]

At trial Taylor did not deny that he committed the homicide (although he was less forthright with the police following his arrest). He instead maintained that he acted under a sudden and intense passion provoked by Siniscalchi and hence was guilty only of voluntary manslaughter. At the close of the evidence, the judge tendered to the jury the Illinois pattern murder instructions followed by the pattern voluntary manslaughter instructions. The manslaughter instructions placed upon Taylor the burden of proving that he possessed a mitigating mental state. In addition, the instructions did not direct the jury to consider Taylor's manslaughter defenses in the event it found both elements of murder. The jury returned a murder verdict, and the judge sentenced him to 35 years of imprisonment. (Taylor's conviction and concurrent 6–year sentence for home invasion is not at issue here.)

On direct appeal, Taylor challenged his conviction on the ground, among others, that the jury instructions improperly assigned him the burden of proof on the mitigation issue. The trial judge, he argued, should have required the prosecution to *disprove* beyond a reasonable doubt his "sudden and intense passion" defense. The Illinois appellate court did not reach the merits of this claim, holding that Taylor had waived it by not raising it at trial. *People v. Taylor*, 151 Ill.App.3d 1167, 113 Ill.Dec. 681, 515 N.E.2d 490 (4th Dist.1987) (unpublished order). The Illinois Supreme Court denied his petition for leave to appeal on June 4, 1987. Since Taylor did not file a petition for writ of certiorari with the United States Supreme Court, his conviction became final on that date.[2]

Taylor then sought post-conviction relief in the Illinois courts. The trial court dismissed his petition. Subsequently, the Illinois Supreme Court in *Reddick*, 122 Ill. Dec. at 5–6, 526 N.E.2d at 145–46, invalidated jury instructions similar for all relevant purposes to those given at Taylor's trial; the Court held (endorsing the argument Taylor made on direct appeal) that, under Illinois law, the state bears the burden of disproving beyond a reasonable doubt issues that would mitigate a homicide from murder to voluntary manslaughter. With *Reddick* in hand, Taylor appealed the trial court's denial of post-conviction relief. The Illinois appellate court nonetheless affirmed, explaining that *Reddick* did not correct "constitutional error," the only grounds available to support state post-conviction relief when a defendant had waived a claim at trial. *People v. Taylor*, 181 Ill.App.3d 538, 130 Ill.Dec. 101, 536 N.E.2d 1312 (4th Dist.1989) (unpublished order). The Illinois Supreme Court again denied his petition for leave to appeal.

His state remedies exhausted, Taylor filed a petition for a writ of habeas corpus in federal district court under 28 U.S.C. § 2254. Eleven days later, we held in *Falconer v. Lane*, *supra*, that the jury instructions invalidated on state law grounds in *Reddick* also transgressed the federal due process clause. The district court in this case agreed that Taylor's jury instructions were invalid under both *Reddick* and *Fal-*

1. Pursuant to amendments to the Illinois Criminal Code effective July 1, 1987, the crime of "murder" is now "first degree murder," and "voluntary manslaughter" is now "second degree murder." *See* Ill.Ann.Stat. ch. 38, ¶¶ 9–1, 9–2 (Smith–Hurd 1991); *Fleming v. Huch*, 924 F.2d 679, 680 n. 1 (7th Cir.1991); *People v. Brown*, 218 Ill.App.3d 890, 161 Ill.Dec. 522, 526, 578 N.E.2d 1168, 1172 (1st Dist.1991).

2. Or, perhaps, 90 days later. *Penry v. Lynaugh*, 492 U.S. 302, 314, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989), held that a defendant's conviction becomes final on the date the United States Supreme Court denies his petition for certiorari on direct review. For defendants, like Taylor, who do not seek certiorari in the Supreme Court, it is unclear whether finality occurs on the date the state Supreme Court rules (or denies review), or 90 days later when the period for seeking certiorari expires. In any event, the issue is moot here since both *Reddick* and *Falconer* were decided more than 90 days after June 4, 1987.

*coner.* 770 F.Supp. at 446. However, it held that both cases, decided after Taylor's conviction became final, announced new rules that did not fall within either of the two exceptions carved by *Teague* and its progeny. *Id.* at 448. Since *Teague* deprives habeas petitioners of the retroactive benefit of new rules not falling within either exception, *see Saffle v. Parks,* 494 U.S. 484, 487–88, 110 S.Ct. 1257, 1259–60, 108 L.Ed.2d 415 (1990), the court denied Taylor's petition. This appeal followed.

## II.

The district court rested its decision upon an interpretation of law, not a determination of fact. Our review is therefore *de novo.* Because the process of distinguishing new rules from old under *Teague* is complicated and of somewhat novel application in this circuit,[3] we survey the terrain to structure our inquiry into whether *Reddick* and *Falconer* indeed announced new rules, or whether both simply applied established rules in a different factual context.

■ In *Teague,* the Supreme Court defined a "new rule" as one that "breaks new ground," "imposes a new obligation on the States or the Federal Government," or "was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070 (emphasis in original). The Court refined its definition in subsequent cases, holding that a decision announces a new rule if it is contrary to earlier "reasonable, good-faith interpretations of existing precedents" by lower federal courts or state courts. *Butler v. McKellar,* 494 U.S. 407, 414, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). "[T]he fact that a court says that its decision was within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether [it] is a 'new rule' under *Teague.*" *Id.* A

case applies an old rule only if its holding is "compelled" by precedent. *Sawyer v. Smith,* —— U.S. ——, 110 S.Ct. 2822, 2828, 111 L.Ed.2d 193 (1990). In contrast, a case puts forth a new rule if its outcome was "susceptible to debate among reasonable minds," or unless a contrary result would have been "an illogical or even a grudging application" of prior precedent. *Butler,* 494 U.S. at 415, 110 S.Ct. at 1217–18; *see also Sawyer,* 110 S.Ct. at 2828–31.

■ With these basic guidelines in mind, we can easily classify as a new rule any decision that explicitly overrules a prior case, *see Butler,* 494 U.S. at 412, 110 S.Ct. at 1217; *Penry v. Lynaugh,* 492 U.S. 302, 353, 109 S.Ct. 2934, 2965, 106 L.Ed.2d 256 (1989) (Scalia, J., concurring and dissenting), significantly departs from precedent, or decides a question previously reserved. *See Teague,* 489 U.S. at 301 & n. 1, 109 S.Ct. at 1070 & n. 1. Conversely, a decision clearly does not announce a new rule if it merely applies precedent, almost directly on point, to a closely analogous set of facts.

■ But, as the Court has recognized on occasion, the "new rule" rule is easier to recite than apply in most cases. *See id.* at 301, 109 S.Ct. at 1070; *Penry,* 492 U.S. at 314, 109 S.Ct. at 2944. It is often difficult to determine whether a case extends prior precedent, or merely applies it in a somewhat different factual context. The lines are fuzzy; in drawing them we remain keenly aware that terms such as "fact," "law," "precedent," and "reasonable" are pliable, and hence susceptible to contrary interpretations. *Compare Penry,* 492 U.S. at 314–19, 109 S.Ct. at 2944–47 (habeas petitioner not seeking new rule) *with id.* at 352–53, 109 S.Ct. at 2965 (Scalia, J., dissenting). Suffice it to say that discerning the domain of a given rule and marking the precise point at which its younger sibling,

---

**3.** To our knowledge, the only case deciding whether a given decision announced a new rule is *Thomas v. Indiana,* 910 F.2d 1413 (7th Cir. 1990). There, we held that the portion of *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), forbidding the prosecu-

tion's use of a defendant's post-*Miranda* warning silence to rebut his insanity defense did not announce a new rule, but rather was compelled by *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

rather than it, applies is more an art than a science.

We discern from *Teague* and its progeny two criteria that offer guidance in distinguishing "old" from "new" rules in murky cases. The first criterion, explicitly employed in *Butler,* is whether any lower federal court or state court reached a different conclusion as to the precise legal issue subsequently resolved by a given decision. In *Butler,* the habeas petitioner argued that *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), did not announce a new rule because it merely applied the dictates of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in a different factual context. The Court disagreed; the fact that there had been a post-*Edwards* circuit split on the issue subsequently resolved in *Roberson* indicated that it was not compelled by precedent, and hence that it announced a new rule. *Butler,* 494 U.S. at 415, 110 S.Ct. at 1217. Prior state court decisions may be considered in this head count, *see id.* (alluding to split in state courts over issue decided in *Roberson*), unless they are based solely on state law. *See Sawyer,* 110 S.Ct. at 2829–31; *Carriger v. Lewis,* 948 F.2d 588, 596–97 (9th Cir.1991).[4]

The fact that a given case departs from prior lower court or state court decisions on the same issue is good evidence that the case was "susceptible to debate among reasonable minds." But it is not dispositive. If a prior lower court or state court decision is not only incorrect, but obviously so, it could hardly be said that the existence of that decision renders a subsequent corrective a new rule. Moreover, the absence of prior contrary decisions does not necessar-

ily indicate that a later case was beyond dispute, and hence not a new rule.

The second criterion, amenable to less precise application than the first, concerns the generality of the precedent underlying the decision at issue. The more general a given set of precedent, the more latent ambiguity inherent in that precedent, and the less likely a subsequent decision is dictated by that precedent—and therefore the more likely it announces a new rule. Conversely, the more specific the given set of precedent, the less likely a decision announces a new rule—assuming, of course, that the precedent is specific in a manner that lends easy application to the decision at issue. As will become clear shortly, applying this criterion requires that one examine precedent, however specific, in light of the factual context in which it arose.

*Sawyer* presents a rather simple illustration of how levels of generality play into *Teague* new rule analysis. Petitioner there maintained that *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)—a case invalidating death sentences imposed by sentencing bodies led (incorrectly) to believe that the ultimate responsibility for sentencing lies elsewhere—was "dictated by the principle of reliability in capital sentencing" established in prior eighth amendment cases. *Sawyer,* 110 S.Ct. at 2828. The Court took exception to this reasoning, noting that *Teague* "would be meaningless if applied at [that] level of generality." *Id.* Simply stated, *Caldwell* was no more "compelled" by the precedent cited by petitioner than it was by the principle that the Eighth Amendment prohibits cruel and unusual punishment. Were it any other way, habeas petitioners could circumvent *Teague* by describing the prece-

---

4. In a similar vein, *Sawyer v. Smith, supra*—which held that *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), was a new rule—hints that the presence of a written dissent in a case is evidence that the case announced a new rule. *Sawyer,* 110 S.Ct. at 2828 ("Certainly *Caldwell* was not seen as compelled by the three Justices ... who found a 'lack of authority' in our Eighth Amendment precedents for the approach taken there.") (citation omitted). If the Court meant to make this relevant,

*Sawyer* represents a break from *Penry,* which held, as a threshold matter, that the rule announced therein was not new despite the fact that four Justices dissented on the merits. *Penry,* 492 U.S. at 314–19, 109 S.Ct. at 2944–47. We need not resolve this dispute here since there were no written dissents in *Reddick, Falconer* or either of the decisions affirming *Falconer. See Fleming v. Huch, supra; Rose v. Lane,* 910 F.2d 400 (7th Cir.1990).

dent underlying the case whose benefit they seek at a high enough level of generality. More specificity is required.

Use of the generality criterion is implicit in other post-*Teague* cases. As noted above, *Butler* held that *Roberson* followed, but was not dictated by, *Edwards*, and consequently was a new rule. *Edwards* provides that the fifth amendment bars police from reinitiating interrogation of a suspect in custody once the suspect has requested counsel, and excludes from evidence any confessions elicited during the second (post-request) interrogation. The second interrogation in *Edwards* focused upon the same crime as the first. *Roberson*, decided seven years later, held that the *Edwards* rule applies when the second interrogation focuses upon a different crime than the first. The Court's opinion in *Butler* suggests that *Roberson* was a new rule because (among other reasons) the dictate of *Edwards*—"police shall refrain from all further interrogation after a defendant asks for counsel"—was too general. Owing to the particular factual situation underlying *Edwards*, it was unclear whether a custodial defendant's request for counsel precludes subsequent questioning *only* on the subject of the original interrogation or on *all* subjects. To have "compelled" *Roberson* within the meaning of *Teague*, *Edwards* would have had to be more specific (e.g., "police shall refrain from all further interrogation after a defendant asks for counsel, whether or not the second interrogation involves the same crime than the first"). Or the separate interrogations in *Edwards* would have had to have focused upon different crimes. (Either possibility would have rendered *Roberson* superfluous.) In short, *Butler* deemed *Roberson* "new" because the general rule in *Edwards* had a latent ambiguity; it did not *specifically* forbid subsequent interrogation on matters unrelated to the first interrogation, and thus possibly was limited to resumption of the original line of questioning.

By way of contrast, consider the following hypothetical. Instead of *Edwards* and *Roberson* the Supreme Court decided two similar cases, *Jones* and *Smith*. *Jones* an-

nounced the same rule as *Edwards*, but arose in a case where the first interrogation involved a murder and the second, conducted after the defendant requested counsel, a vehicular homicide. *Smith* reaffirmed the *Jones* rule in a situation where the first interrogation focused on a murder and the second on mail fraud. A habeas petitioner, whose conviction became final after *Jones* but prior to *Smith*, seeks the benefit of the two cases where his two crimes, also subject to sequential rounds of questioning interrupted with a request for counsel, were identical to those in *Smith*. The question arises whether *Smith* announced a new rule. If it did, the petitioner is denied relief; if it did not, he gets the benefit of *Smith* (and, it follows, *Jones*, for if *Smith* is not new, *Jones* applies with equal force).

The state, were it to make the case that *Smith* announced a new rule, would argue as follows. The rule in *Jones*—"police shall refrain from all further interrogation after a defendant asks for counsel"—is too general in light of the factual context in which it arose. *Jones*, in other words, contains a latent ambiguity because it is unclear whether its provisions apply only to cases where both interrogations involved homicides, or perhaps crimes of a similar type (e.g., two different burglaries). *Jones*, then, did not compel *Smith* because the second interrogation there involved a mail fraud scheme, a different type of crime than murder, the subject of the first interrogation.

This argument, however, cuts too finely. The purpose of *Jones* is to prevent reinterrogation once a defendant requests counsel, and the facts of the case clearly indicate that the rule applies regardless of whether the separate interrogations involve separate crimes. That the separate crimes were both homicides, or of the same general type, is of almost no relevance to the gist of *Jones*. (In contrast, one could plausibly—though, ultimately, incorrectly—maintain that the purpose of *Edwards*, in light of its facts, was to prevent renewal of interrogation on the same crime; when the defendant asserted his *Miranda* rights

with respect to crime # 1, he may have been unaware that he was under investigation for crime # 2, or perhaps more willing to talk about his involvement in crime # 2.) The supposed latent ambiguity in *Jones* is a fiction, because no reasonable jurist would distinguish *Smith* from *Jones* on the specious grounds advanced (hypothetically) by the state. It follows that the *Jones* rule, even in light of its particular facts, is specific enough to compel *Smith*, and hence that *Smith* is not a new rule.

To sum up, we adopt the following analysis when deciding whether a case announces a new rule under *Teague*. First, we determine whether the case clearly falls in one category or another—if it overrules or significantly departs from precedent, or decides a question previously reserved, it is a new rule, while if it applies a prior decision almost directly on point to a closely analogous set of facts, it is not. Second, when the question is a close one, we will look to (1) whether the case at issue departs from previous rulings by lower courts or state courts, and (2) the level of generality of prior precedent in light of the factual context in which that precedent arose.

### III.

The Illinois Supreme Court in *Reddick* invalidated jury instructions identical in all relevant respects to those tendered at Taylor's trial. The central issue in *Reddick* was whether, in a homicide case, the defendant or the prosecution bears the burden of proving whether the defendant had a mitigating mental state when the killing occurred. The Court found that this issue was controlled by § 3–2 of the Illinois Criminal Code of 1961 (Ill.Rev.Stat., ch. 38, ¶ 3–2 (1985)). *Reddick*, 122 Ill.Dec. at 5, 526 N.E.2d at 145. Under this provision,

> if a defendant in a murder trial presents sufficient evidence to raise issues which would reduce the charge of murder to voluntary manslaughter, then to sustain the murder conviction, the People must prove beyond a reasonable doubt that those defenses are meritless....

*Id.* at 122 Ill.Dec. at 6, 526 N.E.2d at 146. The Court declared the jury instructions defective because they placed upon the defendant the burden of proving the existence of a mitigating mental state. *Id.*

Both parties here agree that the instructions given at Taylor's trial contravene *Reddick* and that *Reddick* was handed down after Taylor's conviction became final. They disagree as to whether we should accord Taylor the retroactive benefit of *Reddick*. Both parties assume that *Teague* governs here; Taylor maintains that *Reddick* did not announce a new rule, while the state maintains that it did. Their assumption, however, is incorrect. It is irrelevant whether the rule in *Reddick* is new or old, for it was grounded solely on Illinois criminal law, and we are foreclosed from granting habeas relief because a state court committed an error of state law. *See Estelle v. McGuire*, — U.S. —, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984).

By stating our holding in such categorical terms we do not mean to imply that the precise nature of *Reddick* (that it is based solely on state law) was always free from doubt, or even that we had no hand in creating this doubt. In *Rose v. Lane*, 910 F.2d 400, 401 n. 1 (7th Cir.1990), for example, we suggested that *Reddick* "creates a federal claim through *In re Winship* [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)]." While we subsequently characterized this statement as "somewhat unartful shorthand," *Fleming v. Huch*, 924 F.2d 679, 683 (7th Cir.1991), some of our cases may have left the lingering impression that we still believed there was some federal constitutional content in *Reddick*. *See Falconer*, 905 F.2d at 1134 (stating that *Reddick* "obviously considered the errors resulting from the invalid instructions to be of constitutional magnitude"); *id.* (suggesting link between *Reddick* and *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)); *Rose*, 910 F.2d at 402 ("We held [in *Falconer*], following *Reddick*, that the instructions were gravely erroneous and denied the defendant due process of law."); *Fleming*, 924 F.2d at 683

(referring to petitioner's argument as a "*Falconer/Reddick* claim").

We take this opportunity to dispel any such impressions. *Reddick*, according to its own terms, was controlled by § 3–2 of the Illinois Criminal Code. The question here is whether the case was *also* controlled by the federal constitution; *Reddick* left this question unaddressed because of its grounding in state law. We find that it was not. First, any links with the due process principles in *Falconer* are illusory. *Falconer*, as we shall see, did not rest on burden of proof questions, but rather upon the fact that the instructions were confusing and could permit a jury to completely ignore whether the defendant had a mitigating mental state—regardless of who bore the burden of proof. *Falconer*, 905 F.2d at 1136. It is thus inapposite to *Reddick*.

Nor was *Reddick* based upon due process rule underlying *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). *Mullaney* held that the prosecution, to garner a murder conviction, bears the burden of disproving (beyond a reasonable doubt) that the defendant possessed a mitigating mental state when he committed the homicide. It would have controlled the result in *Reddick* but for *Patterson v. New York*, 432 U.S. 197, 212–16, 97 S.Ct. 2319, 2328–30, 53 L.Ed.2d 281 (1977), which limited *Mullaney* to cases where the state includes "malice" as an element of murder. In other words, only if "malice" is an element of murder does the federal due process clause require the prosecution to prove that the defendant did not act under a mitigating mental state. While this distinction seems formalistic—it may permit states to shift the burden of proof on a rather crucial issue only if it omits the term "malice aforethought" from its murder statute—it is, as both Taylor and Illinois concede, the law. *See* App.Br. at 14–16; Resp.Br. at 6.

The question, then, is whether malice was an element of murder in Illinois at the time of Taylor's conviction. It was at one point, but Illinois deleted the phrase "malice aforethought" from its murder statute when it revised the Criminal Code in 1961. Taylor, pointing to several Illinois appellate court decisions, makes a spirited argument that, the amendment notwithstanding, malice remains an element of murder. His argument, however, is doomed by the Illinois Supreme Court's subsequent decision in *People v. Wright*, 111 Ill.2d 18, 94 Ill. Dec. 726, 731, 488 N.E.2d 973, 978 (1986) (malice no longer an element of murder), which we must accept as the definitive interpretation of Illinois law. *See Hebert v. Louisiana*, 272 U.S. 312, 316, 47 S.Ct. 103, 104, 71 L.Ed. 270 (1926).

*Reddick*, therefore, does not rest upon federal due process principles, but rather is controlled solely by the Illinois Criminal Code (which, as it certainly may, gives criminal defendants tried in Illinois courts more breaks than it is required to by the federal due process clause). Any indications to the contrary in our prior decisions are disavowed. Taylor consequently cannot reap the benefit of *Reddick* on collateral review, for we may not grant habeas relief to remedy an error of state law. *See McGuire*, 112 S.Ct. at 480; *Pulley*, 465 U.S. at 41, 104 S.Ct. at 874; *Fagan v. Washington*, 942 F.2d 1155, 1158 (7th Cir. 1991); *Cole v. Young*, 817 F.2d 412, 416 (7th Cir.1987).

In fact, this case is markedly similar to *Engle v. Issac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). In 1974, the Ohio legislature enacted a statute governing the use of affirmative defenses at criminal trials. Most Ohio lower courts, including the court that convicted the habeas petitioner, had interpreted this statute to require criminal defendants to prove self-defense by a preponderance of the evidence. Subsequently, the Ohio Supreme Court in *State v. Robinson*, 47 Ohio St.2d 103, 351 N.E.2d 88 (1976), construed the statute to place only the burden of production upon the defendant; once this burden was satisfied, the state was obligated to disprove self-defense beyond a reasonable doubt. *Engle* found that *Robinson* was not based upon the federal constitution; while *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and its progeny require that the state prove all elements of a crime

beyond a reasonable doubt, Ohio did not make, nor did the constitution require it to make, the absence of self-defense an element of homicide. *Robinson* was thus based solely upon Ohio law, which (like the Illinois Criminal Code) granted criminal defendants greater protection than that afforded by the federal due process clause. The habeas petitioner's only claim, then, was that the jury instructions at his trial did not comply with state law. This, *Engle* held, is not a federal constitutional claim, and hence not a ground for granting habeas relief. *Engle*, 456 U.S. at 120–21 & n. 21, 102 S.Ct. at 1568 & n. 21.

■ For the foregoing reasons, the question of whether *Reddick* constitutes a "new rule" under *Teague* is irrelevant, for we can give the case neither retroactive nor prospective application on collateral review. One problem remains—the state arguably waived this argument by not pushing it either in the district court or on appeal. While we generally disregard waived issues, there are a narrow class of exceptions, primarily those involving "delicate issues of comity." *Thomas v. Indiana*, 910 F.2d 1413, 1415 (7th Cir.1990). The rule of *Pulley* and *Engle*—which forbids federal courts in collateral proceedings from forcing state courts to remedy violations of state criminal law—certainly falls within this class, and hence we apply it despite the state's waiver.

## IV.

*Falconer* was a habeas case in which we considered the same Illinois murder and manslaughter pattern jury instructions invalidated in *Reddick*. The two sets of instructions, we observed, were fine when read separately. *Falconer*, 905 F.2d at 1135. When read together, however, they were susceptible to more than one reasonable interpretation. One such interpretation could have left the jury "with the false impression that it could convict the petition-

er of murder even if she possessed one of the mitigating states of mind described in the voluntary manslaughter instruction." *Id.* at 1136. We reasoned as follows. First, the murder instructions properly laid out the elements of murder, but did not explain that the jury could not return a murder verdict if it found that the defendant had one of the two mental states that would mitigate the homicide to manslaughter. *See id.* Second, the murder instructions preceded the voluntary manslaughter instructions. Consequently, the instructions could have allowed the jury to find that the prosecution proved both elements of murder, and to conclude that a murder verdict was appropriate, without ever reaching the issue of whether the defendant possessed a mitigating mental state. (This problem would not have arisen had the voluntary manslaughter instructions preceded the murder instructions, or had the murder instructions directed the jury to consider the manslaughter defenses once it found both elements of murder.) We held that this violated the petitioner's due process rights and reversed his murder conviction. This Court reaffirmed *Falconer* in *Fleming v. Huch, supra,* and *Rose v. Lane, supra.*

The parties agree that the instructions given at Taylor's trial were invalid under *Falconer.* We therefore consider only whether *Falconer* announced a new rule, and, if not, whether the defective instructions were harmless beyond a reasonable doubt.[5]

### A.

The state contends that *Falconer* departed from our "previously expressed views of the Illinois murder and voluntary manslaughter statutes." Resp.Br. at 10. If this is true, *Falconer* is definitely a new rule. *See* p. 445 *ante; Teague*, 489 U.S. at 301, 109 S.Ct. at 1070.

---

5. At the outset, we note that Taylor's attorney failed to challenge the jury instructions at trial. Consequently, Taylor arguably waived the issue under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The state, how-

ever, did not push this point in the district court and does not advance it here. It has therefore "waived waiver," *Fagan*, 942 F.2d at 1157, although it is not clear whether a waiver claim would ultimately have succeeded.

The state's strongest argument in this regard is that *Falconer* broke from *Peery v. Sielaff,* 615 F.2d 402 (7th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980), and *Bacon v. De Robertis,* 728 F.2d 874 (7th Cir.), *cert. denied,* 469 U.S. 840, 105 S.Ct. 143, 83 L.Ed.2d 82 (1984). Both cases (according to the state) hold that a court's refusal to tender voluntary manslaughter instructions at a homicide trial does not violate due process. If this were all *Peery* and *Bacon* held, *Falconer* would indeed be new—if we had previously held that a *complete* denial of voluntary manslaughter instructions comports with due process, a subsequent decision holding that a *constructive* denial violates due process certainly breaks from precedent. But *Peery* and *Bacon* said more: a court's refusal to tender a manslaughter instruction does not violate due process *unless* the refusal would result in a "fundamental miscarriage of justice." *Bacon,* 728 F.2d at 875; *Peery,* 615 F.2d at 404. A miscarriage occurs "if *credible* evidence in the record would support a verdict based on [the omitted] instruction." *Bacon,* 728 F.2d at 875; *see also Nichols v. Gagnon,* 710 F.2d 1267, 1269 (7th Cir.1983), *cert. denied,* 466 U.S. 940, 104 S.Ct. 1918, 80 L.Ed.2d 465 (1984). Since there was no evidence that the defendants possessed a mitigating mental state in either *Peery* or *Bacon,* the courts' refusal to tender voluntary manslaughter instructions satisfied due process. In contrast, the defendant in *Falconer* presented such evidence, leading the trial judge there to tender a voluntary manslaughter instruction, albeit defective, to the jury. The facts of *Falconer,* then, took the case beyond the reach of *Peery* and *Bacon.* Consequently, it cannot be said to represent a break from those two cases.

*Falconer* is not the type of case that departed from precedent and hence obviously announced a new rule. Further, since there was no precedent directly on point at the time *Falconer* was decided, nor was it clearly an application of an old rule. We therefore apply the two-part analysis laid out above for difficult "new rule" cases.

**B.**

**1.**

■ Our first inquiry is whether lower courts or state courts had previously disagreed with the ruling we subsequently handed down in *Falconer.* The state points to *Fleming v. Gramley,* 735 F.Supp. 302 (C.D.Ill.1990) (*"Fleming I "*), *rev'd sub nom., Fleming v. Huch,* 924 F.2d 679 (7th Cir.1991) (*"Fleming II "*), as evidence of such a split. *Fleming I* denied habeas relief sought by a petitioner who was convicted of murder by a jury given the murder and manslaughter instructions subsequently invalidated in *Falconer.* In doing so, however, the court did not reject the due process rule underlying *Falconer.* Rather, it denied relief on the ground that the petitioner was not entitled to a mitigation instruction because she presented insufficient evidence to support a voluntary manslaughter verdict. *Fleming I,* 735 F.Supp. at 307–08. *Fleming I* therefore implemented, albeit without citation, our decisions in *Peery* and *Bacon,* which held that due process requires the trial judge to tender manslaughter instructions (in a murder trial) only if the record contains such evidence. If, the court seemed to suggest, the petitioner was not entitled to manslaughter instructions in the first instance, she cannot complain that the instructions ultimately tendered were defective.

*Fleming I* never reached, even tangentially, the central issue decided in *Falconer*—what due process requires in the event a defendant presents credible evidence that *could have* supported a manslaughter verdict. (The petitioner in *Falconer* had cleared this threshold.) Seen in this light, *Fleming I* is distinguishable from *Falconer* on factual, not legal, grounds. *See id.* at 307–08. It therefore does not represent the type of frontal assault on *Falconer* which suggests prior disagreement with the precise legal issue decided therein. *See Thomas,* 910 F.2d at 1415–16.

The state also calls our attention to *People v. McGee,* 110 Ill.App.3d 766, 66 Ill.Dec. 894, 443 N.E.2d 1057 (2d Dist.1982), and

*People v. Howard,* 139 Ill.App.3d 755, 93 Ill.Dec. 831, 487 N.E.2d 656 (2d Dist.1985), two cases that affirmed murder convictions returned by juries given the same instructions later invalidated in *Reddick* and *Falconer.*[6] These cases, however, were based solely on state law, *see McGee,* 66 Ill.Dec. at 901–02, 443 N.E.2d at 1063–64; *Howard,* 93 Ill.Dec. at 835–36, 487 N.E.2d at 660–61, and hence are not evidence of a pre-*Falconer* difference of opinion. *See* p. 446 *ante; Sawyer,* 110 S.Ct. at 2829–31.

We therefore find no indication that lower courts or state courts had previously split on the issue ultimately decided in *Falconer.*

### 2.

Our second inquiry concerns the generality of the case law underlying *Falconer. Falconer* considered itself an application of *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973), which provides that a federal court may overturn a state conviction if the "ailing" jury instructions tendered by the trial judge "so infected the entire trial that the resulting conviction violates due process." The state, however, argues that even if *Falconer* applied *Cupp,* nothing about *Cupp* dictated the result in *Falconer.* It is correct. Unlike *Falconer, Cupp* did not speak to circumstances where the challenged instructions were susceptible to more than one reasonable interpretation. Moreover, *Cupp* did not specify what types of infirmities would violate due process. *Cupp* is therefore too general to have compelled *Falconer* within the meaning of *Teague.* We also find, without further discussion, that the other cases cited for support in *Falconer*—including *Clark v. Jago,* 676 F.2d 1099 (6th Cir.1982), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984), and *Reed v. Lane,* 759 F.2d 618 (7th Cir.1985), *cert. denied,* 475 U.S. 1054, 106 S.Ct. 1282, 89 L.Ed.2d 589 (1986)—are either too general or too tangential to have dictated its result.

But this does not end our inquiry. In determining whether a given decision is compelled by precedent, we examine not only the precedent the decision actually cites, but also the precedent it could have cited. Self-characterization has never been considered dispositive in *Teague* new rule analysis. The simple fact that a decision, for whatever reason, fails to cite the authorities that compel it does not render it a new rule, any more than the fact that a decision describes itself as "controlled" by the authorities it cites renders it an application of an old rule. *See Butler,* 494 U.S. at 415, 110 S.Ct. at 1217. If a case is compelled by existing precedent, it is compelled whether it cites that precedent or not (leaving aside whether it was drafted in the most effective manner possible).

*Falconer,* recall, reversed petitioner's murder conviction because the jury could have interpreted the jury instructions as permitting it to return a murder verdict without first considering the defendant's manslaughter defenses. Our holding actually rested upon two premises: first, that the instructions were inherently ambiguous and susceptible to more than one interpretation; and, second, that a murder verdict reached (in accordance with one of these interpretations) without considering a defendant's manslaughter defenses violates due process. An examination of all relevant case law, particularly *Cupp*'s progeny, convinces us that there was precedent specific enough to have compelled each of these premises at the time *Falconer* was decided.

We first consider *Falconer*'s ruling that the challenged jury instructions were ambiguous and susceptible to an erroneous (we assume for the moment it was erroneous) interpretation. Prevailing law at the time *Falconer* was decided provided that, in cases challenging the sufficiency of ambiguous jury instructions, a court must view the instructions "as a whole," *Cupp,* 414 U.S. at 146–47, 94 S.Ct. at 400, and ask "whether there is a reasonable likelihood that the jury has applied the challenged

---

**6.** While the state cites these cases to demonstrate that *Reddick* was a new rule, it is possible that they are also relevant to the novelty of *Falconer.*

instruction in" an invalid manner. *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990). Was *Falconer*'s implied finding—that there was a "reasonable likelihood" that the jury applied the Illinois murder and manslaughter instructions in an erroneous manner—a new rule because no other court had addressed the question? We think not, principally because the *Boyde* rule was stated at a low enough level of generality to render *Falconer* an application of *Boyde* to a different set of facts. The rule has no latent ambiguity; there is no suggestion that it applies to some jury instructions but not to others. *Boyde* simply directs a reviewing court to assess whether, in its opinion, there is a reasonable likelihood that a certain event occurred. This is a quintessentially factual determination. To assert that *Falconer* was new, because it was the first case to assert that a particular set of instructions was ambiguous and susceptible to different interpretations, would obliterate the distinction between rules and their applications, and thereby contravene the principles of *Teague.*

· Second, we consider *Falconer*'s holding that instructions permitting a jury to reach a murder verdict without considering evidence that would warrant mitigation to voluntary manslaughter (in accordance with a reasonable interpretation of those instructions) violates due process. *Connecticut v. Johnson,* 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), considered jury instructions that created an erroneous presumption on the element of intent. The instructions were previously invalidated in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), but *Johnson* elaborated on *Sandstrom;* the Court explained that the instructions were forbidden because they led the jury to ignore exculpatory evidence in finding the defendant guilty of murder beyond a reasonable doubt. *Johnson,* 460 U.S. at 84–85, 103 S.Ct. at 976 (plurality opinion). We believe

that this due process principle[7] is specific enough to have dictated the result in *Falconer*. Evidence of a mitigating state of mind in a homicide prosecution, while leaving a defendant guilty of manslaughter, would still exonerate as to murder. If we accept that a reasonable interpretation of the instructions in *Falconer* would have lead the jury to ignore evidence of this type, the instructions clearly contravene the principle advanced in *Johnson.*

Granted, one could conceivably argue that *Johnson* does not address the specific issue under consideration in *Falconer,* and hence does not dictate its result. *Johnson* involved instructions that lead the jury to ignore exculpatory evidence as to intent, an *element of the crime* (attempted murder) of which petitioner there was convicted. *Falconer,* in contrast, involved instructions that lead the jury to ignore evidence regarding a mitigating mental state, the absence of which (in Illinois) is not an element of murder, but rather the presence of which is an *affirmative defense.* This argument, however, carves an insignificant distinction. What ultimately mattered in *Johnson* was that the jury could not weigh evidence that may have led to an acquittal on the charge of conviction—regardless of whether the evidence related to an element of the crime or an affirmative defense. In a state that defines manslaughter and murder as separate crimes, and at a trial where a defendant is constitutionally entitled to voluntary manslaughter instructions, a homicide committed under a sudden and intense passion is no more a murder than a homicide committed without the intent to kill. In this light, the principle laid out in *Johnson* is indistinguishable from that applied in *Falconer.*

In accordance with the two-pronged analysis established herein, we find that *Falconer* is not a new rule, and hence that Taylor is entitled to its retroactive application.

---

7. *Johnson* was a plurality opinion, but the dissent did not take issue with this particular portion of the opinion. Rather, the dissent disputed the plurality's suggestion that instructions violating *Sandstrom* warrant nearly automatic reversal, and argued instead that such errors should be subject to *Chapman* harmless error analysis. *Id.* 460 U.S. at 94–102, 103 S.Ct. at 981–85 (Powell, J., dissenting). The dissent's view ultimately prevailed in *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), and we accordingly apply harmless error analysis to the instructional error in this case.

## C.

■ We now consider whether the erroneous jury instructions at Taylor's trial were harmless beyond a reasonable doubt. *See Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The state contends that the jury, had it been constitutionally instructed, would have still (beyond a reasonable doubt) returned a murder verdict, and therefore that the error was harmless under *Chapman.* We have rejected similar contentions in the past, finding that the constitutional errors in the Illinois murder/manslaughter pattern instructions were "inherently prejudicial." *Fleming,* 924 F.2d at 683; *Rose,* 910 F.2d at 403; *Falconer,* 905 F.2d at 1137. This is particularly true in Taylor's case. Taylor admitted at trial to killing Siniscalchi; his entire defense rested upon his contention that he had acted under a sudden and intense passion and was consequently entitled to a manslaughter verdict. *See* XIII Tr. at 126–40 (closing argument of defense counsel). The trial judge, by granting Taylor's request to tender manslaughter instructions, apparently believed that there was enough evidence in the record to support mitigation to manslaughter. *See id.* at 98–101 (colloquy on jury instructions). Had there been insufficient evidence in that regard, the judge would not have been obliged to grant Taylor's request. *See Peery,* 615 F.2d at 404. Our review of the record confirms the trial judge's belief—although there is certainly enough evidence to allow a reasonable jury to return a murder verdict as well. We therefore conclude that the error at Taylor's trial was not harmless.

\* \* \* \* \* \*

We grant Taylor's petition for a writ of habeas corpus. The writ shall issue unless the State of Illinois elects to retry him within 120 days.

REVERSED.