**UNITED STATES of America ex rel. Marilyn CUEVAS, Petitioner,**

v.

**Odie WASHINGTON, Warden, Dixon Correctional Center, Respondent.**

**No. 91 C 07339.**

United States District Court, N.D. Illinois, E.D.

May 15, 1992.

---

Paul W. Schroeder, Michael Rachlis, Charles Edward Watson, II, Jones, Day, Reavis & Pogue, Chicago, IL, for petitioner.

Steven J. Zick, Asst. Atty. Gen., for respondent.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Petitioner Marilyn Cuevas is now before this court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Presently, Cuevas raises the following claims: (1) that she was denied due process of law because the instructions given to the jury at trial allowed the jury to return a verdict of murder despite findings that should have resulted in a verdict of voluntary manslaughter; and (2) that her sentence for attempted murder was imposed simultaneously with the murder sentence and, as such, must be vacated in the event that the murder conviction is vacated. For the reasons set forth below, Cuevas' petition for habeas relief is granted in part and denied in part.

### I. Background

Following a jury trial in the Circuit Court of Cook County, Cuevas was convicted of the murder of Hector Rivera and the attempted murder of Juana Torres. The following facts supporting these convictions are taken from the opinion of the appellate court on direct review, and are presumed accurate. 28 U.S.C. § 2254(d) (1988).

Hector Rivera (hereinafter the decedent) and Sally Evans, began living together in 1981. They were married in 1984 and remained married until decedent's death on June 7, 1984. Shortly after they were married, decedent moved in with defendant, but visited and telephoned his wife twice a week.

Sally Evans testified that she saw decedent on June 1, 1984 at her mother's house. On that day, defendant telephoned her looking for decedent. Defendant told Evans that "[s]he was going to stab Evans and kill [decedent]—that she had her gun ready."

Victoria Rosario, Evans' cousin, testified that on June 1, she witnesses the telephone conversation between Evans and defendant. Later that day, around 5

p.m., defendant called Rosario at her home looking for Evans. Defendant again restated her threats. In addition, she told Rosario that "she was throwing all of [decedent's] stuff out the window, all of his clothes, and she didn't want him around here no more and if he comes there, she's going to give it to him real good."

Juana Torres, decedent's girl friend, testified that on June 7, 1984, around 11 p.m., she and decedent visited a bar called La Zona Roja, where defendant worked. She saw defendant there. Defendant called Torres to the bathroom to talk. After their conversation, she left the bathroom and sat down with decedent and his brother, Miguel. Defendant approached them, called Torres a whore, pushed her to the floor and a fight began. Torres got up and pushed the defendant. When the fight was over, decedent, Torres and defendant were thrown out of the bar. Torres testified that she left the bar first, followed by decedent and the defendant.

Torres walked two or three blocks and stopped in a bar to use the telephone. Decedent and defendant followed Torres into the bar. Defendant stopped Torres from using the phone. Torres hung the phone up and left the bar intending to go to a nearby police station. Decedent and defendant also left the bar.

Torres testified that when she got near the police station, defendant called her a whore. Decedent then called the defendant a whore. Next, Torres heard a shot, looked at defendant, saw her with a revolver and saw the decedent grab his leg and walk towards defendant. Decedent then grabbed defendant's pistol, pulling her arm upwards. Defendant and decedent began struggling over the gun. Next, Torres saw defendant walking towards her with the pistol. When Torres looked backwards, decedent was already on the ground. Defendant pointed the revolver at decedent. Torres heard another shot but kept looking straight ahead. At that point, defendant began shooting at Torres. Torres felt heat in one of her hands. Defendant continued shooting at her as Torres walked in a zig-zag pattern to avoid the shots until she reached the police station where she called out for the police.

Chicago Police Officer Shirley Jobe testified that on June 7, 1984, at around 11:55 p.m., she was leaving the station when she heard several shots and saw people running towards her car. Defendant approached Jobe, still holding the gun in her hand, dangling it from her index finger. Defendant handed Jobe the gun and said, "Here is the gun. I just shot him." Jobe further testified that defendant appeared to be "half-bragging, almost bragging" when she ran up to her. Defendant told Jobe that the gun was empty. Jobe then took the defendant into the station where she was placed under arrest. Jobe read defendant her *Miranda* rights.

Defendant testified on her own behalf. She stated that early in the morning on June 7, 1984, she saw decedent with some other men outside of La Zona Roja as she was leaving work. Defendant got a gun from the man she was with before entering her apartment, because she feared decedent was going to get her. When she entered her building, decedent grabbed her with both hands and scratched her face. Defendant got the gun out and took a shot at him. She reported this incident to the police. Decedent was arrested for disorderly conduct.

Later that night, around 11 p.m., defendant and a friend went to the police station to post bond for the decedent, but he had already been released. At about 11:30 p.m., defendant went to La Zona Roja where she saw decedent dancing with Torres. Defendant told Torres to leave the bar but Torres refused. Decedent spoke to defendant and defendant became "real mad." Defendant said to decedent: "can she talk for herself? Isn't she enough woman to speak for herself?" After that, defendant went to the bathroom and asked her friend for a knife in case decedent tried to get between Torres and herself. However, de-

fendant's friend did not give her a knife. Instead, defendant took out and loaded a .22 caliber automatic gun, put the gun in her jeans and approached the table where decedent and Torres were sitting.

Defendant told Torres to leave, grabbed her by the blouse and pushed her. Decedent hit defendant once in the face. He picked defendant up and defendant bit him on the arm. Decedent punched defendant. After the fight broke up, defendant left the bar with a friend.

Torres and decedent also left the bar. Defendant testified that "we were going down the street arguing." Torres went into a bar, followed by defendant and decedent. Defendant then went into the bathroom to wash her hands and observed scratches on her face. She testified that she got "real mad because [decedent] had no right to get involved in a women's affair." She left the bathroom and tried to fight Torres while Torres was on the phone. Defendant further stated that while in the bar, she was afraid of decedent but never tried to tell the bartender that decedent was going to kill her. Outside of the bar, she again tried to fight with Torres. Torres said she did not want to fight and decedent told Torres to go home. While decedent's back was turned, defendant pulled out the gun. Decedent turned his face toward defendant and defendant shot him in the back of the leg. Defendant stated that decedent came towards her, grabbed her, and then three or four shots went off.

*People v. Cuevas*, (1st Dist.1990) [195 Ill. App.3d 1106, 164 Ill.Dec. 115, 582 N.E.2d 323 (Table)].

On direct appeal, Cuevas raised the following issues: (1) whether the jury instructions used at trial violated her right to due process; (2) whether the trial court properly rejected defendant's voluntary manslaughter instruction based on sudden passion; (3) whether the trial court properly

denied defendant's involuntary manslaughter instruction; (4) whether the trial court properly excluded the defense expert's testimony on the battered wife syndrome; (5) whether the trial court properly allowed testimony on re-cross examination regarding defendant's plea negotiations; and (7) whether defendant's sentence for attempted murder was proper since she was given one sentence for two separate crimes. The appellate court affirmed. *Id.,* slip op. at 16. Following her unsuccessful appeal, Cuevas filed a petition for leave to appeal to the Illinois Supreme Court with respect to three issues decided adversely to her by the Illinois Appellate Court: (1) whether the erroneous jury instructions constituted harmless error; (2) whether the trial court properly excluded the defense expert's testimony on the battered wife syndrome; and (3) whether the trial court properly rejected Cuevas' involuntary manslaughter instruction. The Illinois Supreme Court denied the petition for leave to appeal.

## II. Jury Instructions

At the time of Cuevas' conviction, murder was defined as the killing of an individual with either the intent to kill or do great bodily harm, or knowledge that the acts would cause, or create a strong probability of, death or great bodily harm. Ill.Rev. Stat. ch. 38, ¶ 9–1 (1983). The crime of voluntary manslaughter included the elements of murder as set forth in ¶ 9–1, coupled with a mitigating mental state— that the defendant acted either under a sudden and intense passion arising from serious provocation, or under an unreasonable, but honest, belief that deadly force was justified to prevent his imminent death or great bodily harm. *Id.* ¶ 9–2.[1] Finding that Cuevas was entitled to instructions on both murder and voluntary manslaughter, the court furnished the jury with Illinois Pattern Jury Instructions, Criminal Nos. 7.02 (murder) and 7.06 (voluntary manslaughter—intentional—belief of justification), which provide as follows:

1. As noted in *United States ex rel. Fleming v. Huch,* 924 F.2d 679, 680 n. 1 (7th Cir.1991), pursuant to amendments to the Illinois Criminal Code, effective July 1, 1987, the crime of "murder" under ¶ 9–1 is now labelled "first degree murder," and what was "voluntary manslaughter" is presently "second degree murder."

To sustain the charge of murder, the State must prove the following propositions:

First: That the defendant performed the acts which caused the death of Hector Rivera; and

Second: That when the defendant did so, she intended to kill or do great bodily harm to Hector Rivera; or she knew that her act would cause death or great bodily harm to Hector Rivera; or she knew that her actions created a strong probability of death or great bodily harm to Hector Rivera; and

Third: That the defendant was not justified in using the force which she used.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.

---

To sustain the charge of voluntary manslaughter, the State must prove the following propositions:

First: That the defendant performed the acts which caused the death of Hector Rivera;

Second: That when the defendant did so, she intended to kill or do great bodily harm to Hector Rivera, or she knew that her acts would cause death or great bodily harm to Hector Rivera, or she knew that her acts created a strong probability of death or great bodily harm to Hector Rivera; and

Third: That when the defendant did so she believed that circumstances existed which would have justified killing Hector Rivera; and

Fourth: That the defendant's belief that such circumstances existed was unreasonable.

If you find from your consideration of all the evidence, that each one of these propositions has been proved beyond a rea-

sonable doubt, then you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

Record at 745, 747.

### III. Discussion

### A. *Cuevas' Due Process Claim*

■ There can be no question that the jury instructions used in Cuevas' trial were faulty. In *People v. Reddick*, 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141 (1988), the Illinois Supreme Court declared defective jury instructions nearly identical to those tendered at Cuevas' trial. Relying upon Ill.Rev.Stat. ch. 38, ¶ 3–2 (1985), the court held "if a defendant in a murder trial presents sufficient evidence to raise issues which would reduce the charge of murder to voluntary manslaughter, then to sustain the murder conviction, the People must prove beyond a reasonable doubt that those defenses are meritless." *Reddick*, 123 Ill.2d at 197, 122 Ill.Dec. at 5, 526 N.E.2d at 145. Concluding that the jury instructions used in Reddick's trial—Illinois Pattern Jury Instructions Nos. 7.02, 7.04 & 7.06— "essentially assure that, if the jury follows them, the jury cannot possibly convict a defendant of voluntary manslaughter," the court invalidated the instructions under the Illinois Criminal Code of 1961. *Id.*

Two years later, in an effort to "effectuate[ ] the holding of *Reddick*," the Seventh Circuit concluded that the jury instructions at issue likewise run afoul of the due process clause of the United States Constitution. *Falconer v. Lane*, 905 F.2d 1129, 1136 (7th Cir.1990). Citing the due process jurisprudence discussed in *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), and *United States ex rel. Reed v. Lane*, 759 F.2d 618 (7th Cir. 1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 577 (1986), the court in *Falconer* found the jury instructions confusing when read together as a whole:

The hardship for the petitioner in this case is that even though the judge prop-

erly decided that the jury should consider a verdict of voluntary manslaughter, the jury may have been left with the false impression that it could convict the petitioner of murder even if she possessed one of the mitigating states of mind described in the voluntary manslaughter instruction. No matter which side carried the burden of proof on any particular element or defense, there can be no question that a murder verdict would have been improper if the jury had found one of the mitigating mental states. The murder instruction, in other words, read as though voluntary manslaughter did not exist as a crime.

*Falconer*, 905 F.2d at 1136. Accordingly, it is clear that this claim, initially addressed by the Illinois Supreme Court in *Reddick* under state law, is now cognizable in federal habeas corpus proceedings. *See Flowers v. Illinois Dep't of Corrections*, 962 F.2d 703, 705 (7th Cir.1992); *Taylor v. Gilmore*, 954 F.2d 441, 450 (7th Cir.1992); *United States ex rel. Fleming v. Huch*, 924 F.2d 679, 682 (7th Cir.1991); *Rose v. Lane*, 910 F.2d 400, 402 (7th Cir.), *cert. denied*, 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 526 (1990); *United States ex rel. Gladney v. Peters*, 790 F.Supp. 1364, 1368 (N.D.Ill.1992). Moreover, the Seventh Circuit, in a case challenging jury instructions identical to those presently at issue, held that the *Falconer* rule will apply retroactively. *Taylor*, 954 F.2d at 453 (*"Falconer* is not a new rule, and hence ... [the petitioner] is entitled to its retroactive application.").[2]

■ The State does not dispute that Cuevas has exhausted state court remedies by raising the jury instructions issue on direct appeal and in her petition for leave to appeal to the Illinois Supreme Court. Nor does the State argue that Cuevas is pre-

cluded from pursuing her claim in this court by a state procedural bar. Rather, the only barrier to habeas relief asserted by the State is that the jury instructions, while unconstitutional, were harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967). As explained in our recent decision *United States ex rel. Gladney v. Peters*, 790 F.Supp. 1364, 1371 (N.D.Ill.1992), it is far from settled that the harmless error doctrine applies to this particular constitutional violation. Indeed, the Seventh Circuit has repeatedly stated "the constitutional errors in the Illinois murder/manslaughter pattern instructions [are] 'inherently prejudicial.'" *Taylor*, 954 F.2d at 454; *Fleming*, 924 F.2d at 683; *Rose*, 910 F.2d at 403; *Falconer*, 905 F.2d at 1137. However, while this strong language suggests that this court need not entertain the State's harmless error argument, each of the above cited cases includes some discussion pertaining to the prejudice each individual petitioner faced. In any event, there can be no doubt that the erroneous jury instructions at Cuevas' trial were not harmless beyond a reasonable doubt. The trial judge, like the judge in *Taylor*, by granting Cuevas' request to tender the voluntary manslaughter instruction, apparently believed that there was enough evidence to support such a verdict. Indeed, as did the petitioner in *Fleming*, Cuevas presented evidence that she previously had been battered by the decedent. She did not contest the fact that she shot and killed him. Rather she contended that, in light of a history of abuse, she feared and felt threatened by the decedent. Our review of the record reveals that, at a minimum, Cuevas has advanced a colorable claim of an unreasonable belief of justification.[3]

---

**2.** For a detailed discussion of the retroactivity analysis in *Taylor*, see *United States ex rel. Gladney v. Peters*, 790 F.Supp. 1364 (N.D.Ill.1992).

**3.** Respondent, citing *People v. Austin*, 133 Ill.2d 118, 139 Ill.Dec. 819, 549 N.E.2d 331 (1990), implies that the state appellate court's determination that the error was harmless is binding upon this court. This contention, however, is inaccurate. A federal court in determining

whether a federal constitutional error was harmless beyond a reasonable doubt may undertake its "own reading of the record." *United States v. Hasting*, 461 U.S. 499, 510, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983) (citing *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969)).

## B. *Cuevas' Sentence for Attempted Murder*

 Cuevas argues that her sentence for attempted murder, which was jointly issued with the sentence for murder, must fall as it rests on a faulty conviction. In response, respondent argues that Cuevas did not raise this issue in her petition for leave to appeal to the Illinois Supreme Court and, as such, it is procedurally defaulted. We agree. Although Cuevas properly raised the issue on direct appeal to the Illinois Appellate Court, her petition for leave to appeal to the Illinois Supreme Court is devoid of any challenge to her sentence for attempted murder. Cuevas contends that this claim was presented in her request for relief respecting the jury instructions issue. Cuevas, however, fails to point to any specific portion of the petition for leave wherein such a request for relief was made, and this court cannot discern any request for reconsideration of her sentence for attempted murder. Accordingly, she has waived this claim for the purposes of federal review. *See Farrell v. Lane*, 939 F.2d 409, 411 (7th Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 387, 116 L.Ed.2d 337 (1991); *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1132 (7th Cir.1990). Furthermore, Cuevas has not demonstrated adequate cause to excuse her failure to raise the claim in the petition for leave to appeal and actual prejudice resulting from the default. *See Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977).[4]

## IV. Conclusion

 For the reasons stated above, we grant Cuevas' petition for writ of habeas

**4.** In any event, Cuevas' claim is premised on the contention that the trial court sentenced her to one term of imprisonment for both crimes. This was not the case. Indeed, the trial court sentenced Cuevas to 27–years imprisonment for murder and 27–years imprisonment for attempted murder, sentences to run concurrently. Record at 787.

**5.** In the event that this court grants Cuevas a writ of habeas corpus based on the faulty jury instructions, the State requests that we afford the State the option of resentencing Cuevas for voluntary manslaughter rather than retrial. This request is apparently based upon Illinois Supreme Court Rule 615(b)(3), which provides:

corpus respecting her conviction for the murder of Hector Rivera. The writ shall issue unless the State of Illinois elects to retry her within 120 days.[5] We deny Cuevas' request for habeas relief with regard to her sentence for the attempted murder of Juana Torres. It is so ordered.

"On appeal the reviewing court may ... reduce the degree of the offense of which the appellant was convicted." 107 Ill.2d 563 (1985). As a federal court, it is not within our province to determine if Cuevas should be resentenced for voluntary manslaughter under this Rule. As stated by the Seventh Circuit: "It is of course for the Illinois courts to determine whether the *petitioner should be resentenced for voluntary* manslaughter under Rule 615(b)(3) or any other Illinois law." *Falconer*, 905 F.2d at 1132–33 n. 3. If the Illinois courts determine that Cuevas should be resentenced for voluntary manslaughter, so be it. The alternative is retrial.