THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* STEVEN THOMAS LYNCH, Defendant-Appellant.

First District (1st Division)   No. 80—3171

Opinion filed August 9, 1982.

James J. Doherty, Public Defender, of Chicago (Robert M. Guch, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Casimir J. Bartnik, and Raymond Brogan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Steven Thomas Lynch, was found guilty by a jury of the murder of Jack Herdenberg and sentenced to a term of 40 years. He appeals, contending that he was not proved guilty of murder beyond a reasonable doubt and that his sentence was excessive. We affirm.

The record shows: On September 23, 1979, the body of Jack Herdenberg was found in an alley in Maywood by police. He had been shot twice from close range, once in the stomach and once in the head. He also had two cuts on his hand, a cut on his chin and a cut on his neck. The latter was about 2 inches long and 1½ inches deep at the left end but not as deep on the right. In the opinion of the pathologist, the neck wound could have been an attempt to slash his throat.

On September 30, 1979, the police received a call from Bob Green in which he gave them defendant's name in connection with the death of Herdenberg. The next day the police arrested defendant in the

parking lot behind his apartment. During a search of his van, the police found two concrete blocks. Immediately after being given his rights, defendant stated he had killed Herdenberg during a fight, but did not murder him. Defendant had a wound on his head and abrasions on his cheek and shin. The police took him to the hospital. At the hospital, the police played for him a tape of Green's phone call.

Police Sergeant John Reed testified that defendant then told the police that on September 22 he went to Herdenberg's apartment around 4:30 p.m. in connection with some money Herdenberg owed him. Herdenberg attacked defendant with a knife and stabbed defendant on the head and told defendant he was going to kill him.

The record also shows that defendant shot Herdenberg point blank in the stomach and face and slashed his throat. Defendant then went to work his shift as a delivery driver. When his shift ended, he returned to the victim's apartment, cleaned up the blood and disposed of the gun and the blood-soaked cleaning towels. He then placed the body in a sleeping bag, covered the head with a garbage bag and bundled the body up with a belt and chain. He placed the body in his van, which contained two concrete blocks to weight down the body in the river. In order to properly secure the victim's body in the sleeping so it would remain submerged and hidden from the police, defendant had to make additional holes in the belt that helped truss up the body in the bag. He drove his van to a bridge over the Des Plaines River, but before he could discard the body, a police car pulled up. Defendant told the approaching officer that he was fixing a flat tire. When the officer left, defendant abandoned his original plans and drove to Maywood and there dumped the body in an alley.

Judy Baker testified that she moved in with defendant during the first week of July. A few days after this she met Herdenberg, who lived next door to defendant. For the next three weeks she saw Herdenberg every day and became his lover. She also stated that Herdenberg had been hospitalized for drug usage and she knew he took P.C.P. On August 3 defendant told her he was going to kill Herdenberg because he had been pimping or selling out defendant's wife. She told defendant he was crazy. About a week later, she and defendant drove defendant's van to New York. During this trip defendant allegedly told her that when they got back to Chicago he was going to shoot Herdenberg and throw his body in the river. A month later they returned to Cicero and she went to live with Bob Green, who was the father of her illegitimate child. A week after this she again moved in with defendant. Around September 21 Baker visited Herdenberg, but never mentioned defendant's alleged plan. The most she did was to

tell Herdenberg that defendant was crazy and to be careful.

On September 23 defendant told her he "had killed him." Defendant said that he went to Herdenberg's apartment and asked him for some money. The latter had only $25 and tried to give defendant his car. They then started fighting and defendant was cut by a knife as they wrestled around. During this time Herdenberg wound up on the floor, pinned under defendant. Defendant allegedly asked Herdenberg if he had any last words and then shot him. Defendant then cleaned up the apartment and around 3 a.m. disposed of the body. He told her that if caught by the police he would run or tell them he could not remember anything. She informed Bob Green about the killing.

William Ptack testified that he had been convicted of possession of a stolen vehicle and was currently charged with the theft of some silver. He could not make bond and was in jail, where he became defendant's cellmate. Defendant stated that Herdenberg had been killed because he knew where a Nazi Academy was to be built. Defendant also stated he pulled a gun on Herdenberg, but the latter knocked it from defendant and picked up a knife. Defendant then took the knife from Herdenberg, who cut his hand attempting to retrieve the knife. Eventually Herdenberg retrieved the knife and stabbed defendant, at which time defendant shot him.

Ptack went to the State's Attorney and told him about conversations he and defendant had. Later Ptack had his bond lowered to an amount he could afford. He also stated that as a result of his testimony against defendant the State's Attorney would, during Ptack's trial, inform the court that Ptack had been a crucial witness in defendant's trial.

Defendant testified that on September 22 around 4:30 p.m. he went to Herdenberg's apartment. They talked about the $85 defendant had loaned Herdenberg when he bailed him out of jail. Defendant also noticed at this time that Herdenberg was high on P.C.P. and was playing with a combat knife that he always kept around. When defendant got up to go, Herdenberg asked him to stay because he was bored and lonely. When defendant asked him if he was weird, Herdenberg picked up the knife, jumped at defendant and stabbed him on the right cheek. Herdenberg lunged again and a struggle ensued in the kitchen, during which defendant's arm went through the wall. During this struggle, defendant knocked the knife to the floor and they both dived for it. Defendant got the knife first and held on while Herdenberg grabbed the blade in an attempt to retrieve the knife.

Defendant then poked Herdenberg in the stomach and chest with the knife and headed for the door. Before he reached the door, how-

ever, Herdenberg grabbed him from behind and put him in a chokehold. Defendant poked Herdenberg a few times more and they both fell to the floor, with defendant landing on top. Defendant then pointed the knife at Herdenberg's throat and told him to calm down. Herdenberg bucked his legs and threw defendant forward so that the knife speared Herdenberg's neck. Defendant was able to pin him again and then threw the knife to the side. Both were bleeding and defendant offered to call an ambulance for Herdenberg. This was refused. Defendant then entered the bathroom and put a wet towel on his face. At the same time Herdenberg entered the living room with the knife, looked in the mirror and said, "Oh my God" over and over.

Suddenly Herdenberg said, "Steve, I'm going to kill you," and lunged at defendant, cutting his scalp. Defendant then took a derringer from his pocket and shot Herdenberg once in the stomach. Defendant headed for the door, but was grabbed by Herdenberg, who turned him around, knocked the gun from his hand and threw him to the floor. As Herdenberg again approached, defendant grabbed his gun and shot Herdenberg fatally in the head.

Defendant stayed in the apartment until 3 a.m. He then panicked and, because he thought that no one would believe what happened, he cleaned up the apartment and took the body out to dispose of it. After an aborted attempt to throw the body in the river, he put it in an alley. He also threw away the knife, gun, bloody towels and clothes.

Defendant also testified that Ptack had told him he wanted to get out of prison and would do anything to achieve that goal.

Police Officer Zekas testified that he recovered blood swabs from 12 different locations in the apartment. He would have expected to find more blood if a big fight had occurred.

Mr. Imburgia, manager of the restaurant for which defendant delivered pizza, testified that defendant worked from 6 p.m. on September 22 to 2 a.m. on the 23d.

■ Other than defendant, there were no eyewitnesses to the killing. Defendant claims that he was not proved guilty of murder beyond a reasonable doubt because the testimony of Judith Baker and William Ptack was "suspect" since the former never informed the police about the murder when it would have been the natural thing to do and the latter, being in prison, had a motive to lie. This argument of defendant is merely an attack on the credibility of these two witnesses. The jury heard and saw them and was informed of all the facts which bore on their credibility. The jury chose to believe them and not defendant. The question of credibility is properly for the jury to resolve. *People v. Warmack* (1980), 83 Ill. 2d 112, 128, 413 N.E.2d

1254.

■ Defendant also argues that he was acting in self defense in killing Herdenberg. This defense is based solely on his own testimony. This involved a question of his credibility. By their verdict, the jury did not believe him. In light of the other extrinsic evidence, the State met its burden of proving beyond a reasonable doubt that defendant did not act in self defense. The evidence proves that defendant carried out the plan he had earlier told others he was going to do.

■ Defendant further argues that even if his actions were not justified, he was guilty of no more than voluntary manslaughter under sections 9—2(a)(1) and 9—2(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, pars. 9—2(a)(1), (b)). He claims that he killed Herdenberg while in a heated fight and that under section 9—2(a)(1) he was acting under a sudden and intense passion resulting from serious provocation and under section 9—2(b) he believed the circumstances to be such that if they existed they would justify the killing, but his belief was unreasonable. These arguments, too, depend upon his credibility. The extrinsic facts show otherwise. He shot Herdenberg twice at close range and slashed his throat. This, together with his previously announced plan to kill Herdenberg, refutes his claim of mutual heated combat.

The evidence in the record does not raise any reasonable doubt as to defendant's guilt. The holding of the supreme court in *People v. Owens* (1976), 65 Ill. 2d 83, 357 N.E.2d 465, is applicable here:

"We find apposite here our statement in *People v. McDonald,* 62 Ill. 2d 448, 456, that 'it is the function of the jury to pass upon a question of an accused's guilt, and we will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of the accused's guilt. (*People v. Stringer,* 52 Ill. 2d 564, 568; *People v. Peto,* 38 Ill. 2d 45, 49.) We cannot say the evidence in the record before us raises a reasonable doubt of the defendant's guilt.' " 65 Ill. 2d 83, 90.

Defendant contends that the trial court, when sentencing him, conducted the hearing without regard to the objective of rehabilitating defendant and restoring him to useful citizenship and that, therefore, the 40-year sentence imposed was excessive. We disagree.

At the sentencing hearing, the trial court stated:

"The question before the court is a question of punishment. Never does it enter into my mind in such a situation as presents me at this time, rehabilitation. That is a false concept which has been proffered to the Court, rejected by this Court and shall be rejected in almost 99 per cent of the cases, be-

cause in 99 per cent of the cases it is a ridiculous fiction.

We are talking about punishment. That's what we are talking about. *** "

From this statement it is clear that the court had considered rehabilitation but had rejected it because of the circumstances of the killing. Nor can this court say that the 40-year term was excessive. It was within the proper range. (Ill. Rev. Stat. 1979, ch. 38, pars. 1005—5—3(c)(1), 1005—8—1(a)(1).) The trial court specifically rejected the imposition of an extended term.

In *People v. Willingham* (1982), 89 Ill. 2d 352, 364-65, 432 N.E.2d 861, the court said:

"A reviewing court may intervene only upon a showing that the trial court abused the sentencing discretion entrusted to it. (*People v. Cox* (1980), 82 Ill. 2d 268, 275; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154.) The trial court is the appropriate forum to determine a suitable sentence, and the trial judge's decisions with regard to sentencing must be accorded great deference and weight. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154.)"

We cannot say that the trial court here abused its discretion. The conviction and sentence are affirmed.

Affirmed.

CAMPBELL, P. J., and McGLOON, J., concur.