**UNITED STATES of America, ex rel. Steven LYNCH, Petitioner,**

v.

**David SANDAHL, Warden, Shawnee Correctional Facility, Respondent.**

No. 91 C 06730.

United States District Court, N.D. Illinois, E.D.

April 28, 1992.

Opinion on Motion for Reconsideration July 21, 1992.

See also 108 Ill.App.3d 572, 64 Ill.Dec. 181, 439 N.E.2d 110.

J. Mark Lukanich, Walsh, Neville, Pappas & Mahoney, Chicago, Ill., for petitioner.

Marcia L. Friedl, Asst. Atty. Gen., Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Petitioner Steven Lynch is before this court for the second time seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Presently, Lynch's sole contention is that he was denied due process of law because the instructions given to the jury at trial allowed the jury to return a verdict of murder despite findings that should have resulted in a verdict of voluntary manslaughter. Respondent David Sandahl, Warden of the Shawnee Correctional Facility, has answered the petition and now moves to dismiss for failure to exhaust available state remedies. For the reasons stated below, we deny Sandahl's motion to

dismiss and grant Lynch's petition for habeas relief.

## I. Background

Following a jury trial in the Circuit Court of Cook County, Lynch was convicted of the murder of Jack Herdenberg and sentenced to a term of forty years imprisonment. The following facts supporting Lynch's conviction are taken from the opinion of the appellate court on direct review, and are presumed accurate. 28 U.S.C. § 2254(d) (1988).

On September 23, 1979, the body of Jack Herdenberg was found in an alley in Maywood by police. He had been shot twice from close range, once in the stomach and once in the head. He also had two cuts on his hand, a cut on his chin and a cut on his neck. The latter was about 2 inches long and 1½ inches deep at the left end but not as deep on the right. In the opinion of the pathologist, the neck wound could have been an attempt to slash his throat.

On September 30, 1979, the police received a call from Bob Green in which he gave them defendant's name in connection with the death of Herdenberg. The next day the police arrested defendant in the parking lot behind his apartment. During a search of his van, the police found two concrete blocks. Immediately after being given his rights, defendant stated he had killed Herdenberg during a fight, but did not murder him. Defendant had a wound on his head and abrasions on his cheek and shin. The police took him to the hospital. At the hospital, the police played for him a tape of Green's phone call.

Police Sergeant John Reed testified that defendant then told the police that on September 22nd he went to Herdenberg's apartment around 4:30 p.m. in connection with some money Herdenberg owed him. Herdenberg attacked defendant with a knife and stabbed defendant on the head and told defendant he was going to kill him.

The record also shows that defendant shot Herdenberg point blank in the stomach and face and slashed his throat. Defendant then went to work his shift as a delivery driver. When his shift ended, he returned to the victim's apartment, cleaned up the blood and disposed of the gun and the blood-soaked cleaning towels. He then placed the body in a sleeping bag, covered the head with a garbage bag and bundled the body up with a belt and chain. He placed the body in his van, which contained two concrete blocks to weight down the body in the river. In order to properly secure the victim's body in the sleeping bag so it would remain submerged and hidden from the police, defendant had to make additional holes in the belt that helped truss up the body in the bag. He drove his van to a bridge over the DesPlaines River, but before he could discard the body, a police car pulled up. Defendant told the approaching officer that he was fixing a flat tire. When the officer left, defendant abandoned his original plans and drove to Maywood and there dumped the body in an alley.

Judy Baker testified that she moved in with defendant during the first week of July. A few days after this she met Herdenberg, who lived next door to defendant. For the next three weeks she saw Herdenberg every day and became his lover. She also stated the Herdenberg had been hospitalized for drug usage and she knew he took P.C.P. On August 3rd defendant told her he was going to kill Herdenberg because he had been pimping or selling out defendant's wife. She told defendant he was crazy. About a week later, she and defendant drove defendant's van to New York. During this trip defendant allegedly told her that when they got back to Chicago he was going to shoot Herdenberg and throw his body in the river. A month later they returned to Chicago and she went to live with Bob Green, who was the father of her illegitimate child. A week after this she again moved in with defendant. Around September 21st Baker visited Herdenberg, but never mentioned defendant's alleged plan. The most she did was to tell Herdenberg that defendant was crazy and to be careful.

On September 23rd defendant told her he "had killed him." Defendant said that he went to Herdenberg's apartment and asked him for some money. The latter had only $25 and tried to give defendant his car. They then started fighting and defendant was cut by a knife as they wrestled around. During this time Herdenberg wound up on the floor, pinned under defendant. Defendant allegedly asked Herdenberg if he had any last words and then shot him. Defendant then cleaned up the apartment and around 3 a.m. disposed of the body. He told her that if caught by the police he would run or tell them he could not remember anything. She informed Bob Green about the killing.

William Ptack testified that he had been convicted of possession of a stolen vehicle and was currently charged with the theft of some silver. He could not make bond and was in jail, where he became defendant's cellmate. Defendant stated that Herdenberg had been killed because he knew where a Nazi Academy was to be built. Defendant also stated he pulled out a gun on Herdenberg, but the latter knocked it from defendant and picked up a knife. Defendant then took the knife from Herdenberg, who cut his hand attempting to retrieve the knife. Eventually Herdenberg retrieved the knife and stabbed defendant, at which time defendant shot him.

Ptack went to the State's Attorney and told him about the conversations he and defendant had. Later Ptack had his bond lowered to an amount he could afford. He also stated that as a result of his testimony against defendant the State's Attorney would, during Ptack's trial, inform the court that Ptack had been a crucial witness in defendant's trial.

Defendant testified that on September 22nd around 4:30 p.m. he went to Herdenberg's apartment. They talked about the $85 defendant had loaned Herdenberg when he bailed him out of jail. Defendant also noticed at this time that Herdenberg was high on P.C.P. and was playing with a combat knife that he always kept around. When defendant got up to go, Herdenberg asked him to stay because he was bored and lonely. When defendant asked him if he was weird, Herdenberg picked up the knife, jumped at defendant and stabbed him on the right cheek. Herdenberg lunged again and a struggle ensued in the kitchen, during which defendant's arm went through the wall. During this struggle, defendant knocked the knife to the floor and they both dived for it. Defendant got the knife first and held on while Herdenberg grabbed the blade in an attempt to retrieve the knife.

Defendant then poked Herdenberg in the stomach and chest with the knife and headed for the door. Before he reached the door, however, Herdenberg grabbed him from behind and put him in a chokehold. Defendant poked Herdenberg a few times more and they both fell to the floor, with the defendant landing on top. Defendant then pointed the knife at Herdenberg's throat and told him to calm down. Herdenberg bucked his legs and threw defendant forward so that the knife speared Herdenberg's neck. Defendant was able to pin him again and then threw the knife to the side. Both were bleeding and defendant offered to call an ambulance for Herdenberg. This was refused. Defendant then entered the bathroom and put a wet towel on his face. At the same time Herdenberg entered the living room with the knife, looking in the mirror and said, "Oh my God" over and over.

Suddenly Herdenberg said, "Steve, I'm going to kill you," and lunged at defendant, cutting his scalp. Defendant then took a derringer from his pocket and shot Herdenberg once in the stomach. Defendant headed for the door, but was grabbed by Herdenberg, who turned him around, knocked the gun from his hand and threw him to the floor. As Herdenberg again approached, defendant grabbed his gun and shot Herdenberg fatally in the head.

Defendant stayed in the apartment until 3 a.m. He then panicked and, because

he thought that no one would believe what happened, he cleaned up the apartment and took the body out to dispose of it. After an aborted attempt to throw the body in the river, he put it in an alley. He also threw away the knife, gun, bloody towels and clothes.

Defendant also testified that Ptack had told him he wanted to get out of prison and would do anything to achieve that goal.

Police Officer Zekas testified that he recovered blood swabs from 12 different locations in the apartment. He would have expected to find more blood if a big fight had occurred.

Mr. Imburgia, manager of the restaurant for which defendant delivered pizza, testified that defendant worked from 6 p.m. on September 22nd to 2 a.m. on the 23rd.

*People v. Lynch*, 108 Ill.App.3d 572, 573–76, 64 Ill.Dec. 181, 182–84, 439 N.E.2d 110, 111–13 (1st Dist.1982).

On direct appeal, Lynch, with the assistance of a public defender, argued that he was not proven guilty beyond a reasonable doubt and that the sentence was excessive. The appellate court affirmed. *Id.* at 578, 64 Ill.Dec. at 185, 439 N.E.2d at 114. Following his unsuccessful appeal, Lynch filed a *pro se* petition under the Illinois Post-Conviction Act arguing that his trial counsel's failure to introduce evidence regarding the effect of P.C.P. on humans constituted ineffective assistance of counsel. This post-conviction petition was dismissed, and Lynch appealed on the following grounds: (1) ineffective assistance of trial and appellate counsel; (2) that a judge other than the trial judge was required to hear his petition; and (3) that it was a conflict of interest for the Public Defender's office to represent a post-conviction petitioner who was attacking its competence. The Illinois Appellate Court reversed the dismissal of the petition, holding that representation by the Public Defender's office during both Lynch's trial and his post-conviction proceeding presented a per se conflict of interest. The Illinois Supreme Court, however, vacated and remanded the case for further consideration in light of the court's decision

in *People v. Banks*, 121 Ill.2d 36, 117 Ill. Dec. 266, 520 N.E.2d 617 (1987). *People v. Lynch*, 119 Ill.2d 567, 118 Ill.Dec. 478, 521 N.E.2d 1171 (1988). On June 6, 1988, the Appellate Court affirmed the dismissal of Lynch's post-conviction petition. *People v. Lynch*, 169 Ill.App.3d 1170, 132 Ill.Dec. 841, 540 N.E.2d 581 (1st Dist.1988). After a petition for rehearing was filed and denied, the State Appellate Defender filed a petition for leave to appeal to the Illinois Supreme Court. Lynch filed a supplemental petition *pro se*, in which he challenged the jury instructions given at his trial. After this supplemental petition was filed, Lynch's present counsel were granted leave to file an appearance and filed an amended supplemental petition. The amended petition raised an additional issue as to whether the State had deliberately destroyed exculpatory evidence. The Illinois Supreme Court denied Lynch's original, supplemental and amended petitions for leave to appeal.

On September 27, 1989, Lynch filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming (1) that the jury was improperly instructed as to the State's burden of proof regarding murder and voluntary manslaughter, (2) that the State destroyed exculpatory evidence prior to his trial, and (3) that he was denied effective assistance of counsel at trial, on direct appeal of his conviction and throughout the course of his post-conviction proceedings. Finding that, at a minimum, a state court remedy was available for Lynch's claim of ineffective assistance of counsel during his post-conviction proceedings, this court dismissed his petition. *United States ex rel. Lynch v. Sandahl*, No. 89–7364, 1990 WL 16655, 1990 U.S.Dist. LEXIS 1268 (N.D.Ill. Feb. 1, 1990). Rather than appeal this court's order, Lynch filed in the Circuit Court of Cook County a second post-conviction petition, asserting each of the three grounds raised in his federal habeas petition, as well as a new claim that he was denied his right to a fair trial because of certain erroneous evidentiary rulings by the trial court. The Circuit Court granted Lynch an evidentiary

hearing solely on the issue of whether he received effective assistance of counsel on his first post-conviction petition and on the appeal of the denial of that petition. On July 30, 1991, the trial court denied Lynch's second petition for post-conviction relief. Lynch filed a notice of appeal from the trial court's order on August 21, 1991. This appeal is currently pending in the Illinois Appellate Court, First District.

While waiting for review by the appellate court, Lynch filed in this court his second petition for habeas relief. In apparent recognition of recent Seventh Circuit precedent, Lynch appears before this court seeking a writ of habeas corpus on the sole ground that the jury instructions given at trial violated his right to due process of law.

## II. Jury Instructions

At the time of Lynch's conviction, murder was defined as the killing of an individual with either the intent to kill or do great bodily harm, or knowledge that the acts would cause, or create a strong probability of, death or great bodily harm. Ill.Rev. Stat. ch. 38, ¶ 9–1 (1980). The crime of voluntary manslaughter included the elements of murder as set forth in ¶ 9–1, coupled with a mitigating mental state— that the defendant acted either under a sudden and intense passion arising from serious provocation, or under an unreasonable, but honest, belief that deadly force was justified to prevent his imminent death or great bodily harm. *Id.* ¶ 9–2.[1] Finding that Lynch was entitled to instructions on both murder and voluntary manslaughter, the court furnished the jury with Illinois Pattern Jury Instructions, Criminal Nos. 7.02 (murder) and 7.06 (voluntary manslaughter—intentional—belief of justification), which provide as follows:

> To sustain the charge of murder, the State must prove the following propositions:
>
> First, that the defendant performed the acts which caused the death of Jack Her-

denberg; second, that when the defendant did so, he intended to kill, or do great bodily harm to Jack Herdenberg, or he knew that his act would cause death or great bodily harm to Jack Herdenberg, or he knew that his actions created a strong probability of death, or great bodily harm to Jack Herdenberg; and third, that the defendant was not justified in using the force he used.

If you find, from your consideration of all the evidence, that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, from your consideration of all the evidence, you find that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

---

To sustain the charge of voluntary manslaughter, the State must prove the following propositions:

First, that the defendant intentionally or knowingly performed the action which caused the death of Jack Herdenberg, and second, that when the defendant did so, he believes that circumstances existed which have justified—which would have justified killing Jack Herdenberg, and third, that the defendant believed that such circumstances existed was unreasonable.

If you find from your consideration of all the evidence, that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant, guilty of voluntary manslaughter.

If, on the other hand, you find from your consideration of all the evidence, that any of these propositions has not been proved beyond a reasonable doubt, then

---

**1.** As noted in *United States ex rel. Fleming v. Huch,* 924 F.2d 679, 680 n. 1 (7th Cir.1991), pursuant to amendments to the Illinois Criminal Code, effective July 1, 1987, the crime of "murder" under ¶ 9–1 is now labelled "first degree murder," and what was "voluntary manslaughter" is presently "second degree murder."

you should find the defendant, not guilty, of voluntary manslaughter.

Record at 1107–08.

## III. Discussion

There can be no question that the jury instructions used in Lynch's trial were faulty. In *People v. Reddick*, 123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141 (1988), the Illinois Supreme Court declared defective jury instructions nearly identical to those tendered at Lynch's trial. Relying upon Ill.Rev.Stat. ch. 38, ¶ 3–2 (1985), the court held "if a defendant in a murder trial presents sufficient evidence to raise issues which would reduce the charge of murder to voluntary manslaughter, then to sustain the murder conviction, the People must prove beyond a reasonable doubt that those defenses are meritless." *Reddick*, 123 Ill.2d at 197, 122 Ill.Dec. at 5, 526 N.E.2d at 145. Concluding that the jury instructions used in Reddick's trial—Illinois Pattern Jury Instructions Nos. 7.02, 7.04 & 7.06—"essentially assure that, if the jury follows them, the jury cannot possibly convict a defendant of voluntary manslaughter," the court invalidated the instructions under the Illinois Criminal Code of 1961. *Id.*

Two years later, in an effort to "effectuate[ ] the holding of *Reddick*," the Seventh Circuit concluded that the jury instructions at issue likewise run afoul of the due process clause of the United States Constitution. *Falconer v. Lane*, 905 F.2d 1129, 1136 (7th Cir.1990). Citing the due process jurisprudence discussed in *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), and *United States ex rel. Reed v. Lane*, 759 F.2d 618 (1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 577 (1986), the court in *Falconer*

found the jury instructions confusing when read together as a whole:

> The hardship for the petitioner in this case is that even though the judge properly decided that the jury should consider a verdict of voluntary manslaughter, the jury may have been left with the false impression that it could convict the petitioner of murder even if she possessed one of the mitigating states of mind described in the voluntary manslaughter instruction. No matter which side carried the burden of proof on any particular element or defense, there can be no question that a murder verdict would have been improper if the jury had found one of the mitigating mental states. The murder instruction, in other words, read as though voluntary manslaughter did not exist as a crime.

*Falconer*, 905 F.2d at 1136. Accordingly, it is clear that this claim, initially addressed by the Illinois Supreme Court in *Reddick* under state law, is now cognizable in federal habeas corpus proceedings. *See Taylor v. Gilmore*, 954 F.2d 441, 450 (7th Cir. 1992); *United States ex rel. Fleming v. Huch*, 924 F.2d 679, 682 (7th Cir.1991); *Rose v. Lane*, 910 F.2d 400, 402 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 515, 112 L.Ed.2d 526 (1990); *United States ex rel. Gladney v. Peters*, 790 F.Supp. 1364, 1367–1368 (N.D.Ill.1992). Moreover, the Seventh Circuit, in a case challenging jury instructions identical to those presently at issue, held that the *Falconer* rule will apply retroactively. *Taylor*, 954 F.2d at 453 ("*Falconer* is not a new rule, and hence . . . [the petitioner] is entitled to its retroactive application.").[2]

The only barrier to habeas relief asserted by the State is that Lynch has failed to exhaust available state remedies.[3]

---

2. For a detailed discussion of the retroactivity analysis in *Taylor*, see *United States ex rel. Gladney v. Peters*, 790 F.Supp. 1364, 1370–1371 (N.D.Ill.1992).

3. Although not specifically asserted in the State's answer or motion to dismiss, we are compelled to address the issue of harmless error. As explained in our recent decision *United States ex rel. Gladney v. Peters*, 790 F.Supp. at 1371 (N.D.Ill.1992), it is far from settled that the harmless error doctrine applies to this particu-

lar violation. Indeed, the Seventh Circuit has repeatedly stated "the constitutional errors in the Illinois murder/manslaughter pattern instructions [are] 'inherently prejudicial.'" *Taylor*, 954 F.2d at 454; *Fleming*, 924 F.2d at 683; *Rose*, 910 F.2d at 403; *Falconer*, 905 F.2d at 1137. However, while this strong language suggests that this court need not entertain the State's harmless error argument, each of the above cited cases includes some discussion pertaining to the prejudice each individual petitioner faced.

First enunciated in *Ex parte Royall,* 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886), the exhaustion doctrine "is grounded in principles of comity and reflects a desire to 'protect the state courts' role in the enforcement of federal law.'" *Castille v. Peoples,* 489 U.S. 346, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380 (1989) (quoting *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982)). It is not, however, a jurisdictional requirement. *Id.; Granberry v. Greer,* 481 U.S. 129, 131, 107 S.Ct. 1671, 1673–74, 95 L.Ed.2d 119 (1987); *Strickland v. Washington,* 466 U.S. 668, 684, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984); *see also Bowen v. Johnston,* 306 U.S. 19, 27, 59 S.Ct. 442, 446, 83 L.Ed. 455 (1939) (the doctrine "is not one defining power but one which relates to the appropriate exercise of power"). Nonetheless, the requirement creates a "strong presumption in favor of requiring the prisoner to pursue his available state remedies." *Granberry,* 481 U.S. at 131, 107 S.Ct. at 1674. Indeed, as codified in 1948, the exhaustion rule looms as an uncompromising obstacle to state prisoners seeking federal habeas relief:

> (b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has a right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)–(c) (1988). The Supreme Court, however, has not interpreted § 2254 in such strict terms.

■ In general, proper exhaustion requires the petitioner to "fairly present" the issue to the highest court of the state that possesses the power to review the question. *Smith v. Digmon,* 434 U.S. 332, 98 S.Ct. 597, 54 L.Ed.2d 582 (1978); *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (overruled in part, not relevant here, by *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)). "Fair presentation" requires the petitioner to submit to the state court both the factual and theoretical substance of the claim in question. *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (per curiam). If the petitioner has raised the relevant claim before the highest court of the state on direct appeal, he will not be required to raise the issue on any other avenue of relief, *i.e.,* on state post-conviction review. *Brown,* 344 U.S. at 448–49 n. 3, 73 S.Ct. at 403 n. 3; *see also United States ex. rel Falconer v. Lane,* 708 F.Supp. 202, 204 (N.D.Ill.1989). In the instant case, Lynch first raised the jury instructions issue in his petition for leave to appeal to the Illinois Supreme Court. However, raising the claim for the first time in a discretionary appeal to the state's highest court, where the court declines to hear the case, does not constitute "fair presentation" for exhaustion purposes. *Castille,* 489 U.S. at 351, 109 S.Ct. at 1060.

■ Nonetheless, under limited circumstances federal courts may excuse the exhaustion requirement. One such recognized circumstance is in cases where presentation to the state courts would be futile due to adverse supreme court precedent. *See Thompson v. Reivitz,* 746 F.2d 397, 401 (7th Cir.1984), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2332, 85 L.Ed.2d 849 (1985). Such is the case at hand. In *People v. Flowers,* 138 Ill.2d 218, 236, 149

---

In any event, there can be no doubt that the erroneous jury instructions at Lynch's trial were not harmless beyond a reasonable doubt. The trial judge, like the judge in *Taylor,* by granting Lynch's request to tender the voluntary manslaughter instruction, apparently believed that there was enough evidence to support such a verdict. Indeed, our review of the record reveals that, at a minimum, Lynch has advanced a colorable claim of an unreasonable belief of justification.

Ill.Dec. 304, 311, 561 N.E.2d 674, 681 (1990), the Illinois Supreme Court confronted the issue of "whether the *Reddick* decision will retroactively apply to a post-conviction proceeding." The court unequivocally answered the question in the negative. *Id.* at 242, 149 Ill.Dec. at 314, 561 N.E.2d at 684 ("we concluded that the *Reddick* rule should not be applied retroactively"). While the court in *Reddick* relied on the affirmative defense provisions of section 3–2 of the Criminal Code of 1961, Ill.Rev.Stat. ch. 38, ¶ 3–2, the Illinois Supreme Court has since made clear that the *Reddick* rule implicated constitutional rights. *See People v. Shields*, 143 Ill.2d 435, 443, 159 Ill.Dec. 40, 44, 575 N.E.2d 538, 542 (1991); *Flowers*, 138 Ill.2d at 240, 149 Ill.Dec. at 311, 561 N.E.2d at 681. Indeed, the court in *Shields* relied extensively on *Falconer* and subsequent federal precedent:

> Based on the deficiencies described above, we conclude that the use of the erroneous instructions may violate a defendant's due process right to a fair trial. *See Reddick*, 123 Ill.2d at 198, 122 Ill.Dec. 1, 526 N.E.2d 141; *Rose v. Lane* (7th Cir.1990), 910 F.2d 400, 402; *Falconer*, 905 F.2d at 1137; *see also Fleming*, 924 F.2d at 682 ("At oral argument, the State basically (and wisely) conceded that, after *Falconer* and *Rose*, it cannot be disputed that the errors in these jury instructions constitute a violation of due process").

*Shields*, 143 Ill.2d at 444–45, 159 Ill.Dec. at 44, 575 N.E.2d at 542. In light of recent Illinois Supreme Court precedent, it is abundantly clear that forcing Lynch to continue to pursue his *Reddick/Falconer* claim in the state courts would be a futile exercise.[4] Accordingly, Lynch's failure to pursue his current appeal in the state courts prior to seeking federal relief is excused, and we grant his petition for a writ of habeas corpus.

## IV. Conclusion

For the reasons set forth above, we deny respondent's motion to dismiss for failure to exhaust state remedies, and grant Lynch's petition for a writ of habeas corpus. The writ shall issue unless the State of Illinois elects to retry him within 120 days. It is so ordered.

## ON MOTION FOR RECONSIDERATION

ASPEN, District Judge:

Respondent David Sandahl, Warden of the Shawnee Correctional Facility, now moves for reconsideration of this court's ruling dated April 28, 1992. See page ——. In that order, we denied respondent's motion to dismiss, and granted Steven Lynch's petition for writ of habeas corpus. We concluded that the jury instructions used in Lynch's trial violated his right to due process—a right that, although established after his conviction, applies retroactively. Further, we held that neither the exhaustion requirement nor the harmless-error doctrine barred Lynch from obtaining relief. In support of the present motion, respondent contends: (1) that the Seventh Circuit's decision in *Taylor v. Gilmore*, 954 F.2d 441 (7th Cir.1992) (applying the rule of *Falconer v. Lane*, 905 F.2d 1129 (7th Cir. 1990), retroactively), *petition for cert. filed*, (Apr. 27, 1992), was wrongly decided; (2) that this court erred in its harmless error analysis; and (3) that Lynch procedurally defaulted his *Falconer* claim.

■■■ It is settled law that motions for reconsideration "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence."

---

**4.** The State does not contend that *Flowers* and subsequent precedent are adverse to Lynch's claim. Rather, the State contends that the Illinois Supreme Court should be afforded the opportunity to revisit *Flowers* in light of the Seventh Circuit's antithetic holding in *Taylor*. However, as poignantly noted by the petitioner, the Illinois Supreme Court has never felt compelled to accept the decisions of lower federal courts, even respecting federal constitutional questions. *See People v. Bribson*, 129 Ill.2d 200, 135 Ill.Dec. 801, 544 N.E.2d 297 (1989), *cert. denied*, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 797 (1990); *People v. Stansberry*, 47 Ill.2d 541, 268 N.E.2d 431, *cert. denied*, 404 U.S. 873, 92 S.Ct. 121, 30 L.Ed.2d 116 (1971) (overruled in part, not relevant here, by *People v. Laws*, 84 Ill.2d 493, 50 Ill.Dec. 701, 419 N.E.2d 1150 (1981)).

*Publishers Resource, Inc. v. Walker–Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir.1985) (quoting *Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665–66 (N.D.Ill.1982), *aff'd*, 736 F.2d 388 (7th Cir.1984)). As such, this court will not entertain a motion for reconsideration that merely reiterates arguments previously raised. *In re Stotler & Co.*, No. 91–1178, slip op. at 2, 1991 WL 268051 (N.D.Ill. Dec. 3, 1991); *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D.Va.1983); *see also Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D.Ill.1988) ("[T]his Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."). Further, a motion for reconsideration may not be employed as a vehicle to introduce new evidence that could have been produced prior to the entry of judgment. *Publishers Resource*, 762 F.2d at 561. "Nor should a motion for reconsideration serve as the occasion to tender new legal theories for the first time." *Id.*

■ There can be no question that respondent's procedural default argument could have, and should have, been raised in its answer to Lynch's petition and motion to dismiss. Respondent's explanation for this failure is limited to the assertion that he "merely sought expeditious resolution of the case" by limiting the motion to dismiss to the issue of exhaustion. While this court is always mindful of the desirability of expeditious litigation, filing multiple motions to dismiss, each raising one issue at a time, is not the method to achieve such a result. Respecting respondent's displeasure at the current state of the law regarding the retroactive application of *Falconer*, as well as the Seventh Circuit's consistent holding that such a violation is "inherently prejudicial," those issues are properly presented to the Seventh Circuit on appeal, not to this court in a motion for reconsideration. In the absence of any newly-discovered evidence, and finding no manifest error of law or fact, we deny respondent's

motion for reconsideration. It is so ordered.