65 F.3d 170
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Kenneth HAMNER, Petitioner-Appellant,
v.
Odie WASHINGTON and Roland Burris, Respondents-Appellees.
 No. 94-3108.
 United States Court of Appeals, Seventh Circuit.
 Submitted Aug. 22, 1995.*
Decided Aug. 23, 1995.
 
 Before CUMMINGS, COFFEY and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Kenneth Hamner was convicted of murder in Illinois state court following a jury trial and sentenced to twenty five years' imprisonment. People v. Hamner, No. 88-CR-3706 (Ill.Cir.Ct. Oct. 19, 1989). The Illinois Appellate Court affirmed Hamner's conviction and the Illinois Supreme Court denied Hamner's petition for leave to appeal. People v. Hamner, No. 1-89-3237 (Ill.Ct.App. July 15, 1993); People v. Hamner, No. 75967 (Ill.Sup.Ct. Oct. 6, 1993). Hamner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. Sec. 2254. The district court denied Hamner's petition and he appeals.
 
 
 2
 Upon review of the record and district court's order, we have determined that the district court properly denied Hamner's petition for a writ of habeas corpus and AFFIRM for the reasons stated in the district court's Memorandum Opinion and Order dated May 13, 1994, and attached hereto.
 
 ATTACHMENT
 UNITED STATES DISTRICT COURT
 NORTHERN DISTRICT OF ILLINOIS
 EASTERN DIVISION
 
 3
 UNITED STATES OF AMERICA ex rel.
 
 
 4
 KENNETH HAMNER, Plaintiff,
 
 
 5
 v.
 
 
 6
 ODIE WASHINGTON and ROLAND W. BURRIS, Defendants.
 
 Case No. 94 C 0851
 MEMORANDUM OPINION AND ORDER
 ASPEN, District Judge:
 
 7
 Petitioner Kenneth Hamner is presently before us seeking a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2254. In his petition, Hamner raises the following claims: (1) the police lacked probable cause to arrest him; (2) the trial court erred in refusing to instruct the jury on voluntary manslaughter; (3) the trial court erred in refusing to allow Hamner to testify to a conversation in which another individual admitted committing the crime at issue; and (4) the trial court erred in refusing Hamner's request for a continuance. For the reasons set forth below, we deny Hamner's petition.
 
 I. Background
 
 8
 Petitioner Kenneth Hamner was convicted of murder in the Circuit Court of Cook County. He appealed to the Illinois Appellate Court, which affirmed his conviction. That court's findings of fact are presumed correct. Lewis v. Huch, 964 F.2d 670, 671 (7th Cir.1992). Accordingly, we adopt the factual findings set forth in People v. Hamner, No. 1-89-3237 (Ill.App.Ct. July 15, 1993):
 
 
 9
 At trial, witness Jonathan Collins testified that in the evening of February 19, 1988, he went to Rufus McClellan's house. Collins was a friend of McClellan's and also lived with McClellan's sister. After arriving at McClellan's home, Collins consumed four beers and one shot of brandy. He then accompanied McClellan and a group of people to Charlar Lounge on Granville Avenue where he had another drink. While at Charlar's Lounge, Collins saw McClellan twice argue with a man whom Collins did not know. He later learned from McClellan that the man was Robert Williams, also known as Sug. At approximately 3 a.m., Williams left the bar with a group of people including a man Collins knew as Lacy. Three or four minutes later, Collins accompanied McClellan outside. Williams was a block away near the elevated train station when Williams and McClellan began yelling at each other. When McClellan approached Williams, Williams began to physically fight with him. Lacy attempted unsuccessfully to break up the fight. Williams told one of the women in his group to "go make a phone call." Collins testified that he did not hear a name mentioned. On cross-examination, Collins admitted that when the police originally interviewed him he told them that Williams may have told the woman to call "Tony."
 
 
 10
 A few minutes later, Collins saw a man come "out of the dark." Collins later described the man to the police as black, about 20 years old, wearing a blue jacket, a hat, and jeans. Collins testified that he told the police the man was light-complected. Collins heard Williams tell the man to "[s]hoot the motherfucker." The man reached into his jacket pocket, pulled a gun from his right pocket and shot McClellan. Collins phoned the police and after they arrived described the assailant and Williams to them.
 
 
 11
 Later on the day of February 20, 1988, Collins viewed a lineup in which he tentatively identified defendant Hamner as the man who shot McClellan. He testified that at the time of the lineup he was not sure of the identification. In court, Collins pointed out Hamner as the man he had identified in the lineup. After the lineup, as Collins was leaving, he spotted a blue jacket on a police office desk. Collins told police that the jacket looked like the one he described the assailant as wearing. The following day, Collins viewed a photo montage and identified Williams.
 
 
 12
 Chicago police officer Richard Alder testified that he arrived at the scene of the crime at 3:12 a.m. He phoned for an ambulance, and interviewed Collins. Alder testified that Collins did not mention the complexion of the assailant.
 
 
 13
 Chicago police Detective Patrick Flynn testified that he and his partner investigated the crime scene after interviewing witnesses at the hospital where McClellan was pronounced dead. Flynn testified that the scene was well lit with street lighting and lighting from the train station. The detectives also attempted unsuccessfully to find additional witnesses, including the man identified as Lacy.
 
 
 14
 On February 21, 1988, at approximately 3:30 a.m., Flynn and his partner interviewed Hamner at the police station. Hamner told Flynn that he left his apartment on February 20, 1988, at 3 a.m. to buy a pack of cigarettes. He further stated that he was near the Granville elevated train attempting to call his girl friend from a pay phone when he noticed a crowd across the street and observed a man known to him as Sug in a fistfight with someone whom he did not know. Hamner told Flynn that he walked across the street and the victim said something to him and then moved his hand toward his pocket. Hamner told Flynn that he never saw a weapon in the victim's hand.
 
 
 15
 Sergeant Robert O'Leary testified that after having been briefed on the McClellan shooting, he and three other detectives went to 1055 West Granville at approximately 11 a.m. to investigate an unrelated aggravated battery case, also a shooting. The detectives knocked on the door of apartment 1106 which was registered to Anthony Burnside. Burnside admitted the detectives. Detective O'Leary testified that Burnside signed a voluntary consent form after which the detectives searched the apartment. The consent form was presented at trial. Also in the apartment at the time the detectives arrived was a man who identified himself as Drak or Kenneth Hamner.
 
 
 16
 In searching the apartment, the detectives recovered a telephone directory with the name "Sug" and a phone number written in it. The number was registered to Robert Williams. The detectives also recovered a partial box of .380 or 9-millimeter metal-jacketed short bullets, a partial box of jacketed 9-millimeter long bullets, and a box of loose .38-caliber bullets. Detective O'Leary testified that the bullets would fire from a semiautomatic handgun and were consistent with an expended bullet taken from McClellan's body as shown in a photograph presented to him by the prosecuting attorney. The parties also stipulated that the bullet removed from McClellan was a .38-caliber bullet. The officers also recovered a blue jacket. On cross-examination, O'Leary testified that nothing in his apartment had Hamner's name on it. The detectives took Burnside and Hamner to the police station where they were interviewed separately and placed in the lineup viewed by Collins.
 
 
 17
 Detective James Gildea testified that on February 20, 1988, at approximately 6:30 p.m., he and his partner interviewed Hamner at the police station. Hamner had been at the station for approximately seven hours. Gildea told Hamner that a witness had identified defendant in a lineup and identified his jacket. The detectives accompanied Hamner to an underground parking garage on North Winthrop to look for the weapon used in the homicide.
 
 
 18
 When Gildea came on duty the next day at approximately 4:30 p.m., Hamner was in the police station. Gildea saw Assistant State's Attorney Perkins go into the interrogation room to interview Hamner at approximately 10 p.m. Later Gildea saw a court reporter enter the interrogation room. As part of the investigation, Gildea and Detective Elmore attempted unsuccessfully to locate Sug, Dollar Bill, Lacy, and the women present at the scene of the crime. They were also unsuccessful in locating the weapon involved.
 
 
 19
 Detective Robert Elmore testified that he participated in several interviews of Hamner. Initially, Hamner denied any involvement in the killing of McClellan. Later, after Elmore told Hamner that he had interviewed Burnside, Hamner admitted shooting the gun, but stated that he did so because the victim moved his hand toward his pocket as if reaching for something. Hamner did not see a weapon in McClellan's hand at any time.
 
 
 20
 At approximately 10:30 p.m. on February 21, 1988, Assistant State's Attorney Jacqueline Perkins interviewed Hamner at the police station with Detective Elmore and a court reporter present. Perkins testified that Hamner consented to the presence of the court reporter. Hamner told Perkins that he lived with Anthony Burnside at 1055 West Granville, apartment 1106. At 2 a.m. on February 20, 1988, Hamner looked out the apartment window and saw a crowd of people standing under the elevated train platform. Hamner loaded his .38 automatic and went outside. Once outside, Hamner saw a man he knew as Sug fighting with another man. Hamner walked over to the two men. Sug yelled to him to "[g]ive me the gun," and told Hamner to "[s]hoot the guy." Hamner told Perkins that he then "shot the guy"; that "he looked at me funny, so I shot the guy."
 
 
 21
 Hamner told Perkins that after the shooting he ran to the house of a man called Dollar Bill who lived on Winthrop and that he placed the gun under the back of a car parked in an underground parking lot. When Hamner returned to Burnside's apartment, he told Burnside about the shooting. Assistant State's Attorney Perkins did not ask Hamner if McClellan looked like he was reaching for a gun. He never stated this to her, and she did not recall being informed that he had made such a statement earlier.
 
 
 22
 Hamner testified on his own behalf. He stated that at the time of the shooting he was in the apartment with Anthony Burnside when the phone rang. Burnside then left the apartment. When Burnside returned, he and Hamner had a conversation, the contents of which the trial court would not allow into testimony. Hamner denied being on Granville Avenue at the time of the shooting. He denied shooting McClellan. Hamner admitted that he told Perkins that he shot McClellan because he feared for his own life. Hamner had several complaints about his treatment at the hands of the police, however, other than the length of time he was held in continuous custody, Hamner uses none of these complaints as a basis for arguing this appeal.
 
 II. Discussion
 A. Fourth Amendment
 
 23
 Hamner first maintains that the police lacked probable cause to arrest him, and that his arrest should therefore have been quashed, and his subsequent confession suppressed. In Stone v. Powell, 428 U.S. 465 (1976), the Supreme Court held that
 
 
 24
 where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.
 
 
 25
 Id. at 494 (footnotes omitted). Our threshold inquiry must therefore be whether Hamner had a full and fair opportunity to litigate his claim at the state court level. This inquiry involves two parts. We must first consider whether the state procedural mechanism provides this opportunity in the abstract. If it does, we must go on to determine whether this procedural mechanism functioned in the present case, i.e., whether Hamner actually had the opportunity to litigate his claim. United States ex rel. Bostick v. Peters, 3 F.3d 1023, 1027 (7th Cir.1993).
 
 
 26
 Hamner concedes that, in the abstract, Illinois provides defendants an adequate opportunity to raise Fourth Amendment challenges. See id. Instead, he maintains that he did not actually receive a full and fair opportunity to challenge the propriety of his arrest. However, the record indicates otherwise. The trial court held an evidentiary hearing on Hamner's motion to quash, at which Hamner was entitled to, and did, present evidence in support of his claim. In addition, the court heard the testimony of the arresting officer regarding the events leading up to the arrest. Based upon the evidence presented at the hearing, the court concluded that the police did in fact have probable cause to arrest Hamner.
 
 
 27
 Hamner does not dispute that he was allowed to present evidence and have witnesses testify. Nor does he allege that the court effectively prevented from exercising his right to do so. See, e.g., United States ex rel. Bostick, 3 F.3d at 1028; Riley v. Gray, 674 F.2d 522, 527 (6th Cir.), cert. denied sub nom. Shoemaker v. Riley, 459 U.S. 948 (1982). Instead, it appears that the central focus of his objection is that the court ruled against him. This fact, however, does not provide a basis for habeas relief in this context; "full and fair opportunity" does not translate to "favorable resolution." Absent some indication that Hamner was deprived of the opportunity to fully present his objection, or that the court did not consider the entire factual record before it in reaching its decision, we are unwilling to contravene the clear import of Stone. See Townsend v. Sain, 372 U.S. 293, 313 (1963) (enumerating situations in which a petitioner is not provided a "full and fair opportunity" to present a claim). Accordingly, we conclude that Hamner is not entitled to pursue his Fourth Amendment claim in the present action.
 
 B. Jury Instruction
 
 28
 Hamner next asserts that he was entitled to receive a self-defense or voluntary manslaughter instruction. In support, Hamner notes that in a statement to the police, he claimed that he shot McClellan because he thought McClellan was reaching for something in his pocket. This statement, Hamner contends, was sufficient to justify a self-defense or voluntary manslaughter instruction. We disagree.
 
 
 29
 Under the Fifth and Sixth Amendments, "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63 (1988) (citations omitted). The same is true of a lesser offense instruction. Id. However, absent an error which results in an absolute miscarriage of justice, the failure to provide a given instruction does not present a federal constitutional question, and thus will not be considered in a petition for a writ of habeas corpus. United States ex rel. Peery v. Sielaff, 615 F.2d 402, 404 (7th Cir.1979) (citations omitted), cert. denied, 446 U.S. 940 (1980).
 
 
 30
 The Seventh Circuit has recently reiterated the appropriate test in considering whether the failure to proffer a manslaughter instruction violates a defendants constitutional due process rights: "[a] miscarriage occurs 'if credible evidence in the record would support a verdict based on [the omitted] instruction.' " Taylor v. Gilmore, 954 F.2d 441, 451 (7th Cir.1992) (emphasis in original) (quoting Bacon v. DeRobertis, 728 F.2d 874, 875 (7th Cir.), cert. denied, 469 U.S. 840 (1984)), rev'd on other grounds, 113 S.Ct. 2112 (1993). It is uncontroverted in the present case that, in a statement to the police, Hamner claimed that he shot McClellan because he saw McClellan put his hand in his pocket, and Hamner believed that he was reaching for a weapon (though he acknowledged in his statement that he never saw a weapon). Hamner, however, neglects to discuss his other statements, both to the police and at trial. When first arrested, Hamner denied any involvement in McClellan's shooting. He offered the above statement only after the police informed him that he had been identified in a lineup. Later, he informed the Assistant State's Attorney that he shot McClellan because Williams told him to and because McClellan "looked at [him] funny." Finally, at trial, Hamner once again denied any involvement in McClellan's death. Although he acknowledged that he had made the statement that he shot McClellan out of fear for his life, he apparently attributed this statement to extended abusive treatment while in police custody. In sum, there existed no credible evidence that would support a verdict based on voluntary manslaughter or self defense. Hamner himself suggested in his testimony at trial that his statement to that effect was not credible; indeed, he clung to his assertion that he was not involved. Like the trial court and the reviewing court, we are simply unable to conclude that a reasonable jury could have returned a verdict based upon a theory of voluntary manslaughter or self-defense. Accordingly, Hamner is not entitled to habeas relief on this basis.
 
 C. Burnside's Statement
 
 31
 Hamner contends that the trial court erred in refusing to allow him to testify to a statement allegedly made by Burnside to Hamner, in which Burnside admitted to shooting McClellan.[1] The trial court concluded that the statement was inadmissible hearsay; the appellate court affirmed, rejecting Hamner's contention that the statement should have been admitted as a statement against the declarant's penal interest.
 
 
 32
 The admissibility of evidence in a state court proceeding is generally a matter of state, rather than federal, law. Accordingly, an erroneous evidentiary ruling will not generally support a claim for habeas relief. Haas v. Abrahamson, 910 F.2d 384, 389 (7th Cir.1990). In order to constitute a due process violation, and thus justify the granting of a writ of habeas corpus, the alleged error must be
 
 
 33
 "... so 'gross,' 'conspicuously prejudicial,' or otherwise of such magnitude that it fatally infected the trial and failed to afford the petitioner the fundamental fairness which is the essence of due process."
 
 
 34
 Burrus v. Young, 808 F.2d 578, 584 (7th Cir.1986) (quoting Maggitt v. Wyrick, 533 F.2d 383, 385 (8th Cir.1976), cert. denied, 429 U.S. 898 (1977) (citations omitted)). Of course, a prerequisite to Hamner's request for habeas relief on these grounds is that the trial court's ruling was, in fact, in error.
 
 
 35
 Hamner maintained that he should have been able to testify to Burnside's statement notwithstanding the hearsay rule, because of the "statement against declarant's penal interest" exception to that rule. However, under Illinois law, such testimony, which serves to inculpate the declarant and exculpate the defendant-witness, is only admissible if there are significant indicia of trustworthiness which provide assurance of its reliability. See People v. Bowel, 488 N.E.2d 995, 999 (Ill.1986). As a result, courts have generally required that there be corroborating circumstances which clearly indicate the trustworthiness of the statement. See id.; M. Graham, Cleary & Graham's Handbook of Illinois Evidence, Sec. 804.7 (4th ed. 1984). Cf. Fed.R.Evid. 804(b)(3) (same requirement under Federal Rules of Evidence). Here, the only evidence which even arguably supported Hamner's claim regarding Burnside's statement was that Collins testified that he may have heard Williams say "Call Tony," presumably a reference to Burnside. However, given the uncertainty of Collins' recollection, and the innocuous nature of Williams' statement, it is clear that this scrap of evidence is patently insufficient to lend credence to Hamner's claim.[2] Because we conclude that the trial court's exclusion of the testimony was not error, there is no basis for habeas relief on this claim.
 
 D. Continuance
 
 36
 Finally, Hamner alleges that the trial court erred in refusing to allow him a two-week continuance to locate Lacy Boyd, a witness to the shooting. The decision whether to allow a party a continuance is committed to the sound discretion of the trial court. People v. Rivera, 380 N.E.2d 1018, 1020 (Ill.App.Ct.1978). To form the basis for a habeas petition,
 
 
 37
 not only must there have been an abuse of discretion but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process.
 
 
 38
 Hicks v. Wainwright, 633 F.2d 1146, 1148 (5th Cir.1981) (citations omitted). In considering whether a trial court abused its discretion in denying a continuance, courts typically consider the following four factors:
 
 
 39
 (1) whether due diligence has been exercised to obtain the attendance of the witnesses; (2) whether substantial favorable evidence would be tendered by the witness; (3) whether the witness is available and willing to testify; and (4) whether the denial of the continuance would materially prejudice the defendant.
 
 
 40
 United States ex rel. Searcy v. Greer, 768 F.2d 906, 913 (7th Cir.) (citation omitted), cert. denied, 474 U.S. 996 (1985).[3] None of these factors weigh in Hamner's favor. According to the appellate court, Hamner did not begin looking for Boyd until a few months before trial began, although Hamner was arrested some twenty months before he actually went to trial. In addition, Hamner makes absolutely no offer of proof as to Boyd's expected testimony. As a result, it is impossible for us to conclude that "substantial favorable evidence" would be offered by Boyd if he were located and convinced to testify. But there is not even any indication that Boyd would have been located. Both the police and Hamner's private investigator searched for Boyd during the four months preceding the trial; they interviewed his acquaintances and repeatedly visited the bar he was known to frequent, all to no avail. Given the disappearance of the witness and the uncertainty regarding his likely testimony, Hamner can not credibly claim that he was materially prejudiced by the trial court's refusal to grant him a continuance. Because the trial court's ruling in this regard did not constitute an abuse of discretion, it likewise cannot serve as the basis for habeas relief.
 
 III. Conclusion
 
 41
 For the reasons set forth above, Kenneth Hamner's petition for a writ of habeas corpus is denied.[4] It is so ordered.
 
 
 42
 Dated May 16, 1994.
 
 
 
 *
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Cir.R. 34(f). No such statement having been filed, the appeal is submitted on the briefs and record
 
 
 [1]
 We note that, although Hamner raised this issue in his petition, he has failed to discuss it in his memorandum of law. We are therefore deprived of his rationale for asserting that this alleged error provides the basis for habeas relief
 
 
 [2]
 Indeed, other circumstances cast serious doubt on Hamner's claim. Both Hamner and Burnside were included in a lineup, but only Hamner was identified by Collins, albeit tentatively. Furthermore, Hamner did not mention Burnside's alleged confession until trial, despite the fact that he had been held by the police for interrogation for over thirty hours. Finally, there were no other witnesses to the alleged conversation
 
 
 [3]
 These appear to be the same factors considered by the appellate court in reviewing Hamner's conviction. See People v. Hamner, No. 1-89-3237, at 14-15 (Ill.App.Ct. July 15, 1993)
 
 
 [4]
 Given our resolution of the above issues, we likewise deny Hamner's motion for summary judgment